IN THE UNITED STATES BANKRUTPCY COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| In re:<br><br>**DAVID BO HYEON LIM**<br>**AKA BO HYEON LIM**<br><br>    Debtor<br>———————————————<br><br>**THE DONG-A ILBO**,<br><br>     Movant,<br><br>v.<br><br>**DAVID BO HYEON LIM**<br>**AKA BO HYEON LIM**<br><br>and<br><br>**GEORGE W. LIEBMAN, TRUSTEE,**<br><br>     Respondents. | CHAPTER 7<br><br><br>CASE No. 09-27116-DWK |

**CREDITOR DONG-A ILBO'S MOTION AND SUPPORTING MEMORANDUM TO DISMISS THE DEBTOR'S CHAPTER 7 BANKRUPTCY PETITION**

Pursuant to 11 U.S.C. §707(a) ("Section 707(a)"), The Dong-A Ilbo ("Dong-A"), an unsecured creditor of David Bo Hyeon Lim a/k/a Bo Hyeon Lim ("Debtor"), hereby moves this Court to dismiss the Debtor's Chapter 7 bankruptcy petition.  As set out below, Debtor did not file for bankruptcy protection for a fresh start.  Instead, the Debtor's filing of his bankruptcy protection is just the latest example of the Debtor's strenuous efforts to manipulate the legal system and avoid one particular creditor, Dong-A.  The Debtor lacks good faith in filing his

bankruptcy petition as he deliberately conceals his interest in his current business, provides to this Court suspicious schedules concerning his assets and liabilities, and files his bankruptcy petition solely to avoid Dong-A's pending litigation against the Debtor in the United States District Court for the Eastern District of Pennsylvania, captioned as The Dong-A Ilbo v. Bo H. Lim, et al., Case No. CV 08-2399 (GP) ("EDPA Action").  A series of events occurring prior to the Debtor filing his bankruptcy petition clearly demonstrates that the Debtor is simply abusing the bankruptcy protection mechanism to frustrate one particular creditor, Dong-A.

Creditor Dong-A therefore respectfully requests this Court to grant its motion, dismissing debtor's case, as follows.

## JURISDICTION AND VENUE

This Court has jurisdiction to decide this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court, pursuant to 28 U.S.C. §§ 1408 and 1409.  The relief requested in this motion is predicated on 11 U.S.C. § 707(a) ("Section 707(a)").

## STATEMENT OF RELEVANT FACTS

On September 11, 2009, the Debtor filed his Chapter 7 bankruptcy petition.  The Debtor filed the petition while the EDPA Action against him was pending and immediately after the court in the EDPA Action denied the motion to dismiss seeking enforcement of an alleged forum selection clause ("the Debtor's Motion to Dismiss") filed by the Debtor and his company, Korean Daily Tribune, Inc. d/b/a "Dong-A Daily News" ("KDT").  Further, in his bankruptcy petition, the Debtor concealed his interest in his current farm business, and the schedules of his petition contain substantial inconsistencies and ambiguities, thereby creating high suspicion concerning the Debtor's real intention to file a bankruptcy petition.

***Dong-A's Pending Litigation against the Debtor***

In 1994, Dong-A, an established Korean media company, entered into an agreement with the Debtor ("Agreement") where Dong-A allowed the Debtor to publish and sell Dong-A's certain copyrighted works in the Philadelphia, Pennsylvania area.  See Ex. A of Decl. of Hyun Suk Choi in Supp. of The Dong-A Ilbo's Motion to Dismiss the Debtor's Chapter 7 Bankruptcy Petition ("Choi Decl."), ¶¶ 29, 43 – 46.  Since then, the Debtor has successfully developed and expanded his media business by himself and through KDT, chiefly using Dong-A's copyrighted works and other intellectual property.  Id.  ¶¶ 19, 43 – 46, 82 – 88.  A Dun & Bradstreet report states that KDT, which was founded in 1983, had actual sales of $1.5 million for the past three years and employed 45 people.  See Ex. B of Choi Decl.  The Debtor also claims that KDT is comprised of multiple brands and assets, including Dong-A Ilbo, Philadelphia Korean Christian Broadcast, dongausa.com, kyobousa.com, internet radio/TV, Christian Post, Dong-A Cu[l]ture [sic] Center and Dong-A Merchandises.  See Ex. C of Choi Decl.  Indeed, through the efforts of the Debtor and his conspiracy with the other defendants in the EDPA Action, the Debtor was able to establish a business presence in the southeastern portion of the United States with activities centered in Atlanta, Georgia.  See Ex. A of Choi Decl. ¶¶ 16, 47 – 59, 102 – 103.  However, despite the Debtor's dedication and commitment to creating a successful business for over twenty years, the Debtor suddenly sold KDT in March of 2008 to one of the defendants in the EDPA Action while the threat of litigation by Dong-A was imminent.  Id. ¶¶ 134 – 136.

Importantly, the Debtor and KDT improperly used Dong-A's intellectual property including, but not limited to, Dong-A's trademarks, for years without seeking any authorization from Dong-A to build KDT into a successful and profitable business.  Id. ¶¶ 82 – 88.  The Debtor also failed to comply with obligations under the Agreement.  Id. ¶¶ 66 – 73.  Due to the Debtor's infringement of Dong-A's intellectual property and breach of the Agreement, Dong-A

3

ultimately terminated the Agreement in February of 2007 and demanded that the Debtor immediately stop using Dong-A's intellectual property.  Id.  ¶¶ 104 – 106.  Despite Dong-A's numerous cease and desist demands, the Debtor and KDT continued to improperly use Dong-A's intellectual property.  Id.  ¶¶ 109, 114.  Upon the initiation of the EDPA Action, Dong-A suddenly discovered that the Debtor had abruptly sold all of the property and assets of KDT to STV Networks, Inc. ("STV") in March of 2008 for a substantial sum of money and assets even though KDT had been in business since 1983.  Id.  ¶¶ 134 - 136.

On May 22, 2008, Dong-A filed the complaint in the EDPA Action against the Debtor, KDT, and two other defendants and later amended the complaint to include STV as the successor-in-interest to KDT once Dong-A discovered the sale of KDT to STV.  Id.  In the EDPA Action, Dong-A brought claims under federal law as well as Pennsylvania state law against the Debtor and the other four defendants including trademark infringement, copyright infringement, violation of common law unfair competition, violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, breach of contract, unjust enrichment, fraud, conversion, civil conspiracy, gross negligence and negligence.  Id.

On January 29, 2009, after the parties in the EDPA Action conducted the court-ordered limited discovery on personal jurisdiction issues concerning the defendants located in Atlanta, Georgia, the Debtor filed the Debtor's Motion to Dismiss arguing that Dong-A's claims against the Debtor and KDT needed to be resolved in South Korea where Dong-A is located.  See Ex. D and E.  On May 12, 2009, while the Debtor's Motion to Dismiss was pending before the court in the EDPA Action, counsel for the Debtor and KDT in the EDPA Action abruptly filed a motion to withdraw his representation of these two defendants from the EDPA Action based solely upon the Debtor's intention to file for bankruptcy protection without a specified date.  See Ex. F Choi

4

Decl.  The court in the EDPA Action denied this motion to withdraw as counsel.  See Ex. G of Choi Decl.  Although the Debtor's counsel represented that the Debtor would be seeking bankruptcy protection shortly, the Debtor did not immediately file for bankruptcy.  Indeed, for a period of about two months after the Debtor's representation to the Court, the Debtor did nothing, and accordingly, on July 6, 2009, the court in the EDPA Action ordered the parties to submit a status report by July 16, 2009 concerning whether any of the parties to the EDPA Action filed or intended to file a bankruptcy petition.  See Ex. H of Choi Decl.  Upon communication initiated by counsel for Dong-A in the EDPA Action, the Debtor again represented to Dong-A's counsel and to the court in the status report that he intended to file a bankruptcy petition by August 16, 2009 and would be involved in the mandated consumer credit counseling.  See Ex. I of Choi Decl.

However, the Debtor again did not file a bankruptcy petition by August 16, 2009 as he represented to the court in the EDPA Action.  Indeed, the Debtor did not file his bankruptcy petition until the court in the EDPA Action ruled against him on the Debtor's Motion to Dismiss. By the court's order filed on August 31, 2009, the court denied the Debtor's Motion to Dismiss. See Ex. J of Choi Decl.  Notably, although the Debtor had not filed any bankruptcy petition for about four months from the date he initially informed the court in the EDPA Action of his intention to file, the Debtor suddenly filed a Chapter 7 petition on September 11, 2009 with this Court only eleven days after the order denying the Debtor's Motion to Dismiss was filed.  See Ex. K of Choi Decl.  In response to the Debtor's bankruptcy petition, the court in the EDPA Action stayed all activity as to all parties.  See Ex. L of Choi Decl.  At the time the Debtor filed a Chapter 7 petition, the Debtor had already begun defending himself in the EDPA Action for almost a year and a half, and the court began to rule on the various motions to dismiss filed by all

the defendants.  See Ex. M of Choi Decl.  Indeed, initially the Debtor implied that he would

defend the claims in the EDPA Action in South Korea.  See Ex. E of Choi Decl. However,

presumably upon noticing that his argument based upon an alleged forum selection clause may

fail, the Debtor simply began to proclaim that he intended to file for bankruptcy protection,

which the Debtor did not do until finally forced to do so after the court in the EDPA Action ruled

against him.  See Ex. J of Choi Decl.

***Debtor's Sale of His Business***

The Debtor ran a very lucrative and profitable business, through KDT, considering the

actual sales of $1.5 million annually for the past three years, the employment of 45 people by

KDT, and the value the Debtor ultimately received from STV when he sold all of the property

and assets of KDT to STV in March of 2008 while the threat of litigation was pending and

known to the Debtor.  See Ex. B of Choi Decl.; Ex. N of Choi Decl. ¶ 2.1.  According to the

Purchase and Sale Agreement between KDT and STV ("Purchase and Sale Agreement"), KDT

received cash in the sum of $200,000.00, shares of common stock of STV with an aggregate

value of $350,000.00 from STV, and an agreement where STV assumed KDT's liabilities

including KDT's monetary obligations under certain revolving credit accounts and a home equity

loan.  See Ex. N of Choi Decl. ¶ 2.1.  According to the Purchase and Sale Agreement, the value

of all of the outstanding shares of STV is $750,000,000.00.  Id. ¶ 2.1(a).  STV also contracted the

Debtor for six years "at $5,000.00 a month base salary with health benefits for hi[m] and his

wife."  Id. ¶ 2.1(b).  The Debtor is also "entitled to receive an option for a number of shares" of

STV's common stock with an aggregate value equal to $100,000.00.  Id.  Thus, in exchange for

selling his business to STV, the Debtor or KDT received **cash and shares of the common stock**

**of STV with a total value of $650,000.00, a 6-year guaranteed employment contract with**

**STV at $50,000.00 annual salary, and health benefits paid by STV for the Debtor and his wife**.

Notably, there are some discrepancies about the actual consideration paid for KDT by STV. Daniel Kim, a former president of KDT, provided a verified statement in his action against STV that KDT was sold to STV at $1.95 million even though the Debtor claims $200,000.00 in cash was paid to KDT. Compare Ex. O of Choi Decl. ¶ 17 with Ex. K of Choi Decl. at 30. Interestingly, in his Chapter 7 petition, the Debtor states that the Debtor is the "sole shareholder of KDT" and that KDT is an S Corporation. See Ex. K of Choi Decl. at 30. Thus, the Debtor presumably received all or some of the consideration that STV paid to KDT. Notably, STV agreed to give shares of stock in STV to KDT although the Debtor now seemingly lists those shares in his bankruptcy petition presumably because the Debtor actually owns those shares at this point in time. Id. at 10. Now, the Debtor simply proclaims that KDT will be dissolved after the Debtor sold off all assets of KDT, and he personally received as much value as possible from his development of KDT. Id. at 30.

### *Debtor's Concealment of His Interest in Current Business Even After He Amended His Schedules*

The Debtor filed a Chapter 7 petition on September 11, 2009 and amended the petition on November 6, 2009 after the creditors' meeting on October 22, 2009. See Ex. P of Choi Decl. When the Debtor filed a Chapter 7 petition with this Court, the Debtor initially appeared to have concealed his assets and business located in the State of Maryland. In May of 2007, approximately two years before filing bankruptcy, the Debtor and his non-debtor wife, Jae O. Lim, purchased a substantial piece of real property located at 13135 Hidden Acres Lane, Bishopville 21813 comprised of approximately 19 acres ("Property"). See Ex. Q of Choi Decl. The Property is composed of two parcels of land: one parcel with 13.40 acres and the other

parcel with 6.48 acres.  Id.  The Property apparently has been commercially used by the Debtor for an agricultural business, which has not been fully disclosed to the Court.  Id.

Although the Debtor is the current co-owner of the Property, the Debtor initially did not list the Property as an assets in Schedule A – Real Property in his bankruptcy petition.  See Ex. K of Choi Decl. at 8.  The Debtor and his non-debtor wife paid the sum of $1,300,000.00 for the Property, with a first mortgage of $975,000.00.  See Ex. R of Choi Decl. at 1 - 2.  The Debtor paid the remaining portion of the purchase price in cash in the amount of $325,000.00, which was presumably obtained through his business efforts in his ownership of his sole business, KDT, for the past six years.  See Ex. K of Choi Decl. at 32.

Indeed, even after he amended his bankruptcy petition, the Debtor **still fails to reveal his business interest associated with the Property in his bankruptcy petition**.  In April of 2007, the Debtor incorporated a company called Jacobs Farm, Inc. ("Jacobs Farm"), located at the Property.  See Ex. S of Choi Decl.  The purpose of Jacobs Farm is "to operate farms and any related businesses."  Id.  Undoubtedly, the Debtor has actively been involved in management of Jacobs Farm as the sole director of the company.  Id.  Notably, the Debtor and his non-debtor wife obtained additional financing in the amount of $215,000.00 from MidAtlantic Farm Credit, ACA ("MidAtlantic"), to operate Jacobs Farm.  See Ex. R of Choi Decl. at 2.  Further, the Debtor appears to have purchased certain equipment for Jacobs Farm three months prior to filing his bankruptcy petition.  Indeed, the Debtor purchased a multipurpose utility vehicle for his farm business[1] in June of 2009 during the pendency of the EDPA Action and after initially informing the court in the EDPA Action of the Debtor's alleged intention to file for bankruptcy in May of 2009.  See Ex. U of Choi Decl.; Ex. F of Choi Decl.  In view of the facts that the Debtor himself

---

[1] According to the website of the manufacturer of the vehicle, the intended use of the vehicle includes farming, gardening, and landscaping.  See Ex. T of Choi Decl.

incorporated Jacobs Farm, has been the sole director of Jacobs Farm, personally secured additional financing for Jacobs Farm, and purchased equipment for Jacobs Farm, the Debtor has a substantial interest in Jacobs Farm that should have been revealed in this bankruptcy proceeding. The Debtor, however, did not disclose his business interest in Jacobs Farm and his position as the sole director of the company in the Statement of Financial Affairs in his bankruptcy petition or anywhere else in the bankruptcy petition.[2] See Ex. K of Choi Decl. at 32. As the instruction to the bankruptcy petition states, the Debtor is required to "list the names, addresses, taxpayer identification numbers, nature of the business, and beginning and ending dates of all businesses in which the debtor was an officer, director, … within six years immediately preceding the commencement of" his bankruptcy petition. Id.

On November 6, 2009, after the creditors' meeting held on October 22, 2009, the Debtor amended his schedules. See Ex. P of Choi Decl. In the Amended Schedules A and C, the Debtor now discloses his interest in the Property as well as the creditors associated with the Property, but the Debtor claims the Property as exempt. See Ex. V of Choi Decl. The Debtor, however, still does not disclose his director position with Jacobs Farm or any other relevant business interest of the Debtor in Jacobs Farm. Id.

*Inconsistencies and Ambiguities in the Debtor's Bankruptcy Petition*

The Debtor's bankruptcy petition itself contains inconsistencies and ambiguities in various aspects. Initially, although the Debtor, through KDT, received substantial cash and shares of STV's stock with a total value of $650,000.00 only about a year and a half ago, the Debtor now files a Chapter 7 petition and alleges that those assets are exempt from the

---

[2] Pursuant to 18 U.S.C. §§ 152 and 3571, a bankruptcy petitioner will be subject to penalty for making a false statement in his bankruptcy petition: fine of up to $500,000 or imprisonment for up to 5 years, or both.

bankruptcy estate in Amended Schedule C.  See Ex. V of Choi Decl.  Particularly, the Debtor's explanation in the schedules concerning how he spent all of the $200,000.00 he received is inconsistent with his other statements in the schedules.  The Debtor alleges in the Statement of Financial Affairs in his bankruptcy petition that when KDT sold the assets of KDT to STV in March of 2008, KDT also "sold the credit card debts of KDT to STV" and "KDT paid off the remaining debts of KDT with the $200,000 received from the sale."  See Ex. K of Choi Decl. at 30.  The Debtor further stated, "KDT ceased all operation in [March of] 2008[,]" and KDT was the only business he owned for the six years preceding the commencement of this bankruptcy action.  Id. at 30, 32.  By contrast, according to Schedule F – Creditors Holding Unsecured Nonpriority Claims in his bankruptcy petition, the Debtor incurred approximately $252,000.00[3] in credit card debt for business purposes seemingly within a year and a half while his only alleged business stopped its operation in 2008, and all the debts of KDT were either sold or paid in full.  See Ex. K of Choi Decl. at 15 – 20.  Thus, the Debtor seems to have either incurred a substantial amount of credit card debt for his non-existing business, KDT, during such a short period of time or the Debtor simply did not utilize the money received by STV in the manner he describes.  Indeed, considering the Debtor's purchase of a multipurpose utility vehicle for use in Jacobs Farm months before filing for bankruptcy, the Debtor could have incurred all of this debt for his current business, Jacobs Farm.

Next, many of the exemptions claimed by the Debtor contain ambiguities.  According to Amended Schedule C, the Debtor claims that all of the STV stock KDT received from STV regarding KDT's sale of all assets of KDT to STV should be exempt from the Debtor's bankruptcy estate.  See Ex. V of Choi Decl.  While the value of those shares of stock was about

---

[3] The total amount of the Debtor's alleged credit card debt concerning "Business Credit" is approximately $252,000.00 according to Schedule F of his bankruptcy petition.

$450,000.00[4] as of February of 2009, the Debtor does not disclose the value of the stock in his bankruptcy petition and simply claims that all of those shares of stock should be exempted; notably, a former president of KDT alleges that KDT was sold to STV for $1.95 million.  See Ex. V of Choi Decl.; Ex. O of Choi Decl. ¶ 17.  The value of the shares of STV stock is quite substantial; yet, the Debtor claims the property as exempt.  Indeed, the actual ownership of the STV shares by the Debtor is suspect.

According to Amended Schedule C, the Debtor also claims the sum of $50,000.00 he seemingly should receive from STV as a result of a lawsuit against STV for the breach of an employment contract.  See Ex. V of Choi Decl.  Notably, the Debtor has not clarified in his bankruptcy petition whether the sum of $50,000.00 is an actual award or judgment against STV or whether the Debtor intends to file suit against STV for that sum.  Nonetheless, the $50,000.00 claimed against STV is clearly his personal income, which should be used to pay off his debts and claims against him.  Indeed, the trustee recently filed an objection to this sum claimed as an exemption since the sum is neither arising from death, bodily injury, sickness, or accident nor does Maryland law provide an exemption for economic damages allegedly recovered in a lawsuit.  See Ex. W of Choi Decl.; see also Md. Code Ann., Com. Law § 15-601.1 and Md. Code Ann., Cts. & Jud. Proc. Art. § 11-504(b)(3).  Indeed, The Debtor may be seeking a different exemption for the health insurance provided by STV to the Debtor and his wife.  See Ex. N of Choi Decl. ¶ 2.1(b) and Md. Code Ann., Cts. & Jud. Proc. Art. § 11-504(b)(3).

In addition, there are discrepancies with the alleged income and value of the Debtor's investments and employment as listed in the bankruptcy petition.  While the Debtor alleges in

---

[4] According to the Purchase and Sale Agreement, the total value of the shares of STV's common stock the Debtor or KDT initially received was $350,000.00 for the sale of KDT; the Debtor is also entitled to shares of STV stock with an aggregate value of $100,000.00.  See Ex. N of Choi Decl. ¶ 2.1.

Amended Schedule C that the value of his pension plan, which he claims is also exempt, is "unknown," the Debtor actually provided the exact amount of $4,582.00 of his most recent IRA distribution.  Compare Ex. V of Choi Decl. with Ex. K of Choi Decl. at 28.  Further, while he concealed his interest in Jacobs Farm, the Debtor claims that his non-debtor wife is the owner of Jacobs Farm and that his wife's average monthly income from the Jacob Farm business is only $213.00.  See Ex. K of Choi Decl. at 24.  The debtor's representation concerning his non-debtor wife's income, however, is highly suspicious because the current estimate of the annual revenue of Jacobs Farm is allegedly $300,000.00.  See Ex. X of Choi Decl.  Jacobs Farm also allegedly has about ten employees.  Id.

## LEGAL ARGUMENT

Pursuant to Section 707(a), this Court should dismiss the Debtor's petition for Chapter 7 because the Debtor lacks good faith in filing his bankruptcy petition.  Section 707(a) provides that the bankruptcy court "may dismiss a case under this chapter only after notice and a hearing and only **for cause**, including (1) unreasonable delay by the debtor that is prejudicial to creditors; (2) nonpayment of any fees or charges required under chapter 123 of title 28; and (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on a motion by the United States trustee."   (Emphasis added).   "Dismissal for cause under [S]ection 707(a) is not limited to the three examples enumerated within the section."  In re Dinova, 212 B.R. 437, 442 (2d Cir. 1997) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 380 (1977) and S.Rep. No. 989, 95th Cong., 2d Sess. 94 (1978)). Thus, the courts "must engage in case-by-case analysis in order to determine what constitutes 'cause' sufficient to warrant dismissal." Id. at 442.

The Fourth Circuit has made it clear that there is a good faith component to Chapter 7 and that such a requirement "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." In re Kestell, 99 F.3d 146, 149 (4th Cir. 1996). "The right of debtors to a fresh start depends upon the honest and forthright invocation of the [Bankruptcy] Code's protections … 'accuracy, honest, and full disclosure are critical to the functioning of bankruptcy, and are inherent in the bargain for the discharge.'" Id. at 149 (quoting In re Mascolo, 505 F.2d 274, 278 (1st Cir. 1974)). Further, courts "have uniformly held that generally, an implicit prerequisite to the right to file [a bankruptcy petition] is 'good faith' on the part of the debtor, the absence of which may constitute cause for dismissal." Carolin Corp. v. Miller, 886 F.2d 693, 698 (4th Cir. 1989) (quoting In re Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985)). While it appears that the Fourth Circuit has not directly addressed the issue whether dismissal for "cause" under Section 707(a) includes a debtor's lack of good faith in filing a Chapter 7 petition, the courts within the Fourth Circuit have dismissed Chapter 7 petitions due to a debtor's bad faith or lack of good faith in filing a Chapter 7 petition. See generally, McDow v. Smith, 295 B.R. 69, 73 (E.D.Va. 2003). For instance, noting that "for cause provisions in Chapter 11 and Section 707(a) are similarly phrased and structured," the Eastern District Court of Virginia concluded that "just as the Fourth Circuit [in Carolin] held that 'cause' in §1112(b) includes bad faith, based in part on the examples provided in the statute, so to is it appropriate to conclude that 'cause' in [Section] 707(a) includes bad faith as a basis for discretionary dismissal." Id. at 76. Under Section 707(a), "a debtor's bad faith acts or omissions may, in the totality of the circumstances, constitute cause for dismissal in the sound discretion of the bankruptcy court." Id. at 75 (citing In re Zick, 931 F.2d 1124, 1127 (6th Cir. 1991) and In re Tamecki, 229 F.3d 205,

207 (3d Cir. 2000)). Accordingly, a debtor's lack of good faith or bad faith should constitute "cause" under Section 707(a).

Courts have applied various factors in determining bad faith as "cause" under Section 707(a) as follows: "(1) the debtor's concealment or misrepresentation of assets and/or sources of income, such as the improper or unexplained transfers of assets prior to filing; (2) the debtor's lack of candor and completeness in his statements and schedules, such as the inflation of his expenses to disguise his financial well-being; (3) the debtor has sufficient resources to repay his debts, and leads a lavish lifestyle, continuing to have excessive and continued expenditures; (4) the debtor's motivation in filing is to avoid a large single debt incurred through conduct akin to fraud, misconduct, or gross negligence, such as a judgment in pending litigation, or a collection action; (5) the debtor's petition is part of a 'deliberate and persistent pattern' of evading a single creditor; (6) the debtor is 'overutilizing the protection of the Code' to the detriment to his creditors; (7) the debtor reduced his creditors to a single creditor prior to filing the petition; (8) the debtor's lack of attempt to repay creditors; (9) the debtor's payment of debts to insider creditors; (10) the debtor's 'procedural gymnastics' that have the effect of frustrating creditors; (11) the unfairness of the debtor's use of the bankruptcy process." Id. at 80 (citing Zick, supra, at 1129; In re Griffieth, 209 B.R. 823, 826 (Bankr. N.D.N.Y. 1996); In re Spagnolia, 199 B.R. 362, 365 (Bankr. W.D.Ky. 1995); and In re Hammonds, 139 B.R. 535, 542 (Bankr. D.Col. 1992)).  In addition, a debtor's bad faith "may be found when the debtor has a frivolous, noneconomic motive for filing a bankruptcy petition, when there is a sinister or unworthy purpose, or when there is an abuse of the judicial process."  County Banking & Trust Co. v. Kempner (In re Kempner), 152 B.R. 37, 39 (D.Del. 1993) (quoting Lawrence P. Ling, et al., Collier On Bankruptcy ¶ 707.03, at pp. 707-9 to 707-10 (15th ed. 1992)).

In <u>In re Campbell</u>, 124 B.R. 462, 464 (Bankr. W.D.Pa. 1991), the debtor "through obvious clever planning … placed all of his assets beyond the reach of his creditors under non bankruptcy law."  The debtor claimed all of his assets as exempt, but after the alleged exemptions, there would be no asset available for distribution to creditors.  <u>Id.</u>  The court *sua sponte* dismissed the debtor's Chapter 7 petition and emphasized that "although [the] debtor perhaps [was] in technical compliance with the requirements of the Bankruptcy Code, he unquestionably [was] attempting to overutilize the protections afforded by bankruptcy to the unconscionable detriment of his creditors" and concluded that under those circumstances, the debtor was filed his petition in bad faith.

Similarly, in <u>In re Maide</u>, 103 B.R. 696, 698 (Bankr. W.D.Pa. 1989), the debtor transferred his interest in real estate to his non-debtor spouse 18 months prior to his filing of a Chapter 7 petition, and as a result, the transfer "left the debtor with insignificant assets of nominal value."  The court concluded that although the statute of limitations on the avoidance of a fraudulent transfer passed, the debtor's transfer of real estate to his non-debtor spouse indicated the debtor's bad faith.  <u>Id.</u>  Notably, the debtor contended that since it was exemptible, he did not list his pension in the schedules of his bankruptcy petition.  <u>Id.</u>  The court, however, made it clear that regardless of whether the debtor's asset is exemptible, the debtor must disclose its existence and amount.  <u>Id.</u>; <u>see</u> <u>also</u>, <u>In re Hammonds</u>, 139 B.R. 535, 542 – 43 (Bankr. D.Colo. 1992) (granting the creditor's motion to dismiss the debtor's Chapter 7 petition after finding that (1) prior to his filing of the bankruptcy petition, the debtor transferred, without consideration, all of his non-exempt business assets to his wife's company, (2)  the debtor continued to run his wife's company after filing his bankruptcy petition, (3) the debtor continued to live a comfortable life-style, (4) the debtor deliberately and persistently evaded a major creditor, (5) the debtor provided

less than candid schedules and did not provide full disclosure about his interest, assets, and liabilities).

Further, in In re Lombardo, 370 B.R. 506 (Bankr. E.D.N.Y. 2007), the court also dismissed a Chapter 7 petition when the primary purpose of the debtor's filing of a bankruptcy petition was to avoid pending litigation against the debtor. The court found that the debtor filed a Chapter 7 petition only after the creditor indicated to the debtor the creditor's intention to take an action against the debtor to perfect the creditor's interest in the debtor's certain assets. Id. at 513. Through her bankruptcy petition, the debtor attempted to have the creditor's claim discharged and maintain the debtor's assets under state exemption law. Id. at 513. The court further found that the debtor did not suffer "any sudden loss of income or incurred any unexpected, significant expenses in the months leading up to the [d]ebtor's bankruptcy filing" and instead, the debtor was going to receive certain cash from her ex-husband's 401(k), "which would provide the [d]ebtor with an additional source of funds and enable her to pay her creditors." Id. Pointing out the timing of the debtor's bankruptcy petition filing, the court emphasized that "although the amount of the [d]ebtor's liability to her credit card issuers was slowly accruing over the years, the [d]ebtor chose to file for bankruptcy relief only after" the creditor attempted to take an action against the debtor. Id.; see cf. Furness v. Lilienfield, 35 B.R. 1006, 1013 (D.Md. 1983) (in a Chapter 11 case, dismissing the debtor's petition because the time of his petition and his previous actions to delay pending litigation demonstrated that the debtor filed a bankruptcy petition with mere intention "to abuse the judicial process").

Importantly, when "a debtor's good faith is put into question, the debtor bears the burden of proving that the filing was made in good faith." Zick, supra, at 1127 (quoting In re Bingham, 68 B.R. 933 (Bankr. M.D.Pa. 1987)); see also, Office of the United States Trustee v. Mottilla (In

re Mottilla), 306 B.R. 782, 789 (Bankr. M.D.Pa. 2004) (stating that in a motion to dismiss under Section 707(a), the movant is required "to produce relatively little evidence to place a debtor's good faith at issue," which will "shift the burden to [the debtor] to produce affirmative proof of [the debtor's] honest intention in filing [the debtor's] petition."

Here, the Debtor clearly lacked good faith or had bad faith in filing a Chapter 7 petition because (1) the Debtor lacked candor and completeness in preparing and filing his schedules by concealing his assets and his interest in a viable, ongoing business and (2) under the totality of circumstances, the primary reason for the Debtor to file a Chapter 7 petition was to avoid the EDPA Action through clever planning, thereby abusing the judicial process.  Although the Debtor and his non-debtor wife own the Property of which size and value are about 20 acres and $1,300,000.00 respectively, the Debtor initially failed to provide details to this asset in his schedules in his initial bankruptcy petition.  Further, the Debtor also conducts a farm business named Jacobs Farm on the Property, but concealed his interest in Jacobs Farm and his director position with Jacobs Farm.  In addition, contrary to the Debtor's representation that his non-debtor wife earned monthly income of $213.00 from Jacobs Farm, the public record demonstrates that Jacobs Farm has an estimated annual revenue of about $300,000.00 and it has about ten employees.  This failure by the Debtor is not surprising given the Debtor's history of misrepresentations and evasion.

Certainly, the Debtor's statement that his non-debtor wife earns such a small monthly income from Jacobs Farm is subject to further discovery and investigation since the publicly available information on Jacobs Farm conveys a different scenario and the Debtor's history of misrepresentations warrant careful review of the bankruptcy petition.  Based upon the Debtor's apparent concealment of his interest in Jacobs Farm even after he amended the schedules of his

bankruptcy petition, it is easily conceivable that the Debtor filed a Chapter 7 petition in bad faith to receive discharge of all of his debts and claims against him in the EDPA Action while he continues to run his farm business, claims exemptions for the farm business, reaffirms the debt associated with the farm business (see Ex. Y of Choi Decl.), and still receives an annual salary of $60,000, which the Debtor claims is also exempt.  The Debtor, in clear abuse of the bankruptcy protection mechanism, attempts to keep all of his business assets from his creditors and continue to run his farm business.  Thus, if the Debtor is successful in his Chapter 7 petition, the creditors like Dong-A "will be sent away empty-handed while the [d]ebtor retains control of corporate assets and an ongoing business of an undisclosed value."  See Hammonds, supra, at 543.

Moreover, the Debtor is attempting to seek exemptions for all of the assets he procured through his improper use of Dong-A's intellectual property for years.  The Debtor's company, KDT, ran a very lucrative business for years by improperly using Dong-A's intellectual property.  KDT was founded in 1983 and run by the Debtor until it was sold in 2008 to STV.  At the time of sale, KDT had actual annual sales of $1.5 million for the past three years and employed 45 people in its operations in a facility of approximately 10,000 square feet.  See Ex. B of Choi Decl.  Indeed, the Debtor represented in a written letter to a former president of KDT that the value of KDT in 2006 was $1.2 million.  See Ex. C of Choi Decl.  However, when Dong-A's litigation against the Debtor was imminent, the Debtor abruptly sold all of the property and assets of KDT to STV while proclaiming to Dong-A that the Debtor and KDT desired to renew its business relationship with Dong-A.  See Ex. A of Choi Decl. ¶¶ 114 – 115, 134 – 136.  Although the Debtor spent the past twenty years to develop and expand KDT's business, had recently hired a new president in 2007 with the intention of pursing new projects (see Ex. C of Choi Decl.), the Debtor suddenly sold KDT to STV, and now, conveniently, the Debtor claims

that he is unable to pay his debts.  Ultimately, unbeknownst to Dong-A at the time of the transaction, the Debtor received $650,000.00 in cash and shares of STV's stock and a 6-year guaranteed employment contract with STV at a $60,000.00 annual salary[5] and health benefits for the Debtor and his wife.  Notably, he received this substantial amount of assets only a year and a half before he filed this bankruptcy petition.  Then, in an apparent attempt to keep these substantial assets from Dong-A, the Debtor is claiming those assets are exempt under Maryland law.

The Debtor is also seeking an exemption for the amount of $50,000.00 he claims against STV for the breach of the employment contract; however, this sum is clearly his personal income.  Indeed, if in fact the Debtor filed suit against STV or was awarded any judgment, the Debtor would likely be entitled to the full amount of the employment contract or approximately $360,000.00.[6]  Obviously, like the debtor in Campbell, the Debtor "through obvious clever planning," attempts to "place[] all of his assets beyond the reach of his creditors" and "overutilize the protection afforded by bankruptcy to the unconscionable detriment of his creditor."

Further, the Debtor intentionally mischaracterizes those assets he received from STV to mislead the bankruptcy court.  In Amended Schedule C, the Debtor divides the consideration he received from STV into three categories under Maryland law, specifically, Md. Code Ann., Comm. Law § 15-601.1; Md. Code Ann., Cts. & Jud. Proc. § 11-504(b)(3) and (5), disposable wages, professionally prescribed health aids for the Debtor and his wife, and general cash or

---

[5] According to the Purchase and Sale Agreement, the Debtor's monthly salary under the six-year employment contract with STV is $5,000.00.  See Ex. N of Choi Decl. ¶ 2.1(b).
[6] Based upon the Debtor's monthly salary of $5,000.00 for the period of six years of his employment with STV, the total amount of his compensation from STV will be $360,000.00. See Ex. N of Choi Decl. ¶ 2.1(b).

property of the Debtor.  See Ex. V. of Choi Decl.  As the trustee noted, however, the characterization of monies due to the Debtor under employment contract is suspect.  See Ex. W of Choi Decl.  Further, the health insurance plan secured by the Debtor for himself and his wife in the employment agreement with STV is certainly not a "professionally prescribed health aid" under Maryland law.  See Ex. N of Choi Decl. ¶ 2.1(b).  Finally, as previously explained, in Amended Schedule C, the Debtor simply lists 1058 shares of STV stock as exempt, but claims that the current value is unknown.  See Ex. V of Choi Decl.  Upon examination of the Purchase and Sale Agreement, the bankruptcy court can surmise that the value of those shares of stock is quite substantial given the stated value of STV as $750,000,000.00 for purposes of the Purchase and Sale Agreement as well as the verified statement of a former president of KDT who stated that KDT was sold to STV for $1.95 million.  Again, although the Debtor sold KDT and obtained substantial value for the sale, the Debtor now claims to be unable to pay his creditors and needs a fresh start; all of this, suspiciously, within a year and a half from the date the Debtor sold KDT.

Indeed, the true nature of the value given to the Debtor by STV for the sale of KDT's assets and property resembles a retirement package, which the Debtor now attempts to claim as exempt property.  While the actual monies received from STV could have been used to pay the debts of KDT, the Debtor's ultimate retention of the shares of STV stock is clearly an investment for the future of him and his wife; those shares may provide a substantial return or STV could issue dividends providing additional income to the Debtor and his wife.  Further, the Debtor was granted an option to further invest in STV, which resembles a stock option component of a corporate retirement package.  In addition, the Debtor secured a general, nondescript employment contract with STV for an annual salary of $60,000.00, but interestingly, the

Purchase and Sale Agreement lacks any description of the responsibilities of the Debtor to STV. Further, the Debtor has not revealed if a separate employment contract with STV actually exists. The same employment contract secured the Debtor and his wife health benefits to be paid by STV for that same period of time. There is no indication for the reason for the inclusion of the wife of the Debtor in this employment agreement. But certainly, as the Debtor wound down his business activities in KDT, the Debtor wanted to leverage the value of the KDT business to secure a sound retirement package for himself and his wife. Ultimately, the Debtor is attempting to salvage whatever value he can from his illegal and improper use of Dong-A's intellectual property and good will for years.

In addition, the Debtor's statements in the petition are suspicious. According to the Debtor's schedule, the Debtor used up cash in the sum of $200,000.00 he received from STV to pay off KDT's debts. Contrary to the Debtor's representations that KDT stopped its operation after its assets were sold to STV and that the Debtor did not operate any other business in the past six years, the Debtor incurred approximately $252,000.00 in credit card debt, characterized as business debt, within the past year and a half. The Debtor's claimed exemptions are also suspect. While the value of the STV stock he owns or is entitled to own is $450,000.00 as of February of 2009, the Debtor does not disclose the value of those shares of STV stock in his schedules and claims all of those shares are exempt. Also, contrary to his representation that his non-debtor wife earns a monthly income of only $213.00 from Jacobs Farm, the estimated annual revenue of Jacobs Farm is $300,000.00. In addition, the shares of STV stock were originally transferred to KDT as part of the consideration for the sale of KDT's assets; however, the Debtor now lists those shares of STV stock as his personal property, which is subject to an alleged exemption under Maryland law. Undoubtedly, if KDT transferred the shares of STV

stock to the Debtor, there must have been some substantial consideration given by the Debtor to KDT for shares in a company valued at $750,000,000.00 in order for the supposed transfer of those shares by KDT to the Debtor to be reasonable.

Importantly, the Debtor's primary reason for his bankruptcy petition is to avoid the EDPA Action considering the timing of the Debtor's filing of the Chapter 7 petition.  Given the Debtor's past representations and behavior, it is more than likely the Debtor is again attempting to strenuously avoid facing liability for his actions to Dong-A.  The Debtor initially attempted to delay any litigation against him or KDT by continually misrepresenting to Dong-A that the Debtor desired to renew his business relationship with Dong-A and to give the Debtor some time to resolve the issues between the parties, while the Debtor was attempting to secure a competitor of Dong-A as the Debtor's new business partner, which the Debtor successfully accomplished. See Ex. A of Choi Decl. ¶¶ 109 – 115, 116 – 118.  Further, as soon as the Debtor was able to secure a new partnership for his business and the threat of litigation was imminent, the Debtor suddenly sold KDT to STV.  Id. ¶¶ 134 – 136.  Once litigation was instituted by Dong-A, the Debtor continued to strenuously attempt to avoid facing liability to Dong-A.  In the EDPA Action, the Debtor filed a motion to dismiss seeking enforcement of an alleged forum selection clause.  The Debtor argued that Dong-A should have filed its action against him in South Korea and gave the impression that he was willing to go to South Korea to defend himself from Dong-A's claims against him.  Judging from his recent filing of a bankruptcy petition, however, the Debtor never had any intention to defend himself before the courts in South Korea even if his motion to dismiss were granted.  Apparently, the court's denial of the Debtor's motion to dismiss in the EDPA Action caused the Debtor to suddenly file his Chapter 7 petition.  According to the Debtor's letter to a former president of KDT in January of 2007, the Debtor had no intention of

ending the Debtor's business, but, instead sought to expand KDT's reach and market share.  See Ex. C of Choi Decl.

Indeed, when the Debtor informed the court in the EDPA Action of his intention to file a bankruptcy petition in May of 2009, the Debtor's motion to dismiss was still pending before the court.   In May of 2009, the Debtor's counsel initially requested to be allowed to withdraw from the proceedings since the Debtor intended to file bankruptcy shortly.  On June 1, 2009, the court denied the request of the Debtor's counsel and, ultimately, ordered the Debtor to provide a status report concerning his intended bankruptcy petition by July 16, 2009.  In July of 2009, the Debtor again represented to the Court that he intended to file a bankruptcy petition by August 16, 2009, but the Debtor never filed any bankruptcy petition in August.  As a result, the court, having been waiting for about four months while the Debtor made repeated representations concerning his bankruptcy petition filing, started ruling on the motions to dismiss filed by all defendants including the Debtor.  Indeed, once the court denied the Debtor's motion to dismiss, the Debtor finally filed his bankruptcy petition on September 11, 2009, only eleven days after the court in the EDPA Action determined that the Debtor must defend himself and KDT in the Eastern District of Pennsylvania, which the Debtor certainly does not want to do.

As in Lombardo, the Debtor's bankruptcy petition and related schedules do not demonstrate that the Debtor suffered "any sudden loss of income or incurred any unexpected, significant expenses in the months leading up to the [D]ebtor's bankruptcy filing."  Rather, the Debtor is supposed to receive cash in the sum of $50,000.00 from his breach of employment contract claim against STV.  Moreover, the Debtor currently has shares of STV stock valuing $350,000.00, will receive or has received additional shares of STV's stock in an aggregate value of $100,000, and will receive $60,000.00 as an annual salary from STV for the next five years

according to his employment contract with STV.  The Debtor's schedule also shows that the Debtor has received an IRA distribution.  Indeed, the Debtor seemingly intends to continue his business interest in Jacobs Farm, which will undoubtedly provides and will continue to provide income to the Debtor.  Importantly, while the Debtor represented to the court in the EDPA Action in May of 2009 that he would shortly file a bankruptcy petition, the Debtor purchased a multipurpose utility vehicle for his farm business on June 24, 2009.  In view of these circumstances, the Debtor, as the debtor in <u>Lombardo</u>, files for bankruptcy simply to avoid the EDPA Action, and the Debtor's manipulations have been solely to frustrate one particular creditor, Dong-A.  The Debtor is unfairly using the bankruptcy filing to avoid any liability to Dong-A.

Therefore, under the totality of circumstances, it is clear that the Debtor lacks good faith or had bad faith in filing a Chapter 7 petition.  If the Debtor remains in Chapter 7 and obtains a discharge of his debts and claims against him, he will be provided an unfair start, not a fresh start, due to the facts and circumstances surrounding his bankruptcy petition filing and his reasons for seeking Chapter 7 relief.  Accordingly, the Debtor's petition should be dismissed under Section 707(a).

/

[Continued on Next Page]

/

## CONCLUSION

For the foregoing reasons, Movant, The Dong-A Ilbo, requests this Court to dismiss the

Debtor's Chapter 7 petition.


Date:   November 16, 2009

                                                   Respectfully submitted,


                                                   /s/ J. Stephen Simms
                                                   J. Stephen Simms (#4269)
                                                   Simms Showers LLP
                                                   20 South. Charles Street
                                                   Suite 702
                                                   Baltimore, Maryland 21201
                                                   jssimms@simmsshowers.com
                                                   410.783.5795

                                                   **The Park Law Group, LLC**
                                                   Attorneys for Movant,
                                                   The Dong-A Ilbo

                                       By:    /s/ Hyun Suk Choi
                                                   Hyun Suk Choi, Esq.
                                                   Admitted pro hac vice
                                                   23 S. Warren Street
                                                   Trenton, New Jersey 08608
                                                   hchoi@theparklawgroup.com
                                                   609.396.2800

                                                   The Dong-A Ilbo Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of November, 2009, a true copy of the foregoing and
accompanying papers ("Motion Papers") is being served through the ECF system all counsel of record.


                                                   /s/ J. Stephen Simms
                                                   J. Stephen Simms