# EXHIBIT N
## Part 1

PURCHASE AND SALE AGREEMENT

DATED AS OF February 5, 2008

between

**Korean Daily Tribune, Inc.**

and

**STV Networks, Inc.**

# PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of **February 5, 2008**, between **Korean Daily Tribune, Inc.**, a Pennsylvania corporation t/a Chosun Daily News ("Seller"), and **STV Networks, Inc.**, a Delaware corporation ("Buyer"). Seller and Buyer are collectively referred to as the "Parties."

## W I T N E S S E T H:

WHEREAS, Seller is engaged in the business of media and magazine publishing company through its division (the "Division");

WHEREAS, Seller owns or holds certain assets, including fixed assets, machinery, equipment, inventory and other personal property, relationships, technology, contracts and other intangible property, used in the business of the Division as presently conducted or presently proposed to be conducted (the "Business"); and

WHEREAS, Buyer wishes to purchase, and Seller is willing to sell, all of Seller's right, title and interest in and to the Division, together with all of the assets of Seller and its affiliates used by Seller in the conduct of the Business (other than Excluded Assets as defined below), and as part of such purchase and sale of such assets Buyer is willing to assume certain obligations and liabilities of Seller related to the Assets (as defined below) and the Division (other than the Excluded Liabilities as defined below);

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS

1.1     Assets to be Transferred.  Subject to the terms and conditions of this Agreement, and except as otherwise expressly provided in Sections 1.2 and 1.3 hereof, at the Closing (as defined in Section 4.1 hereof), Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, all of Seller's and its affiliates' rights, titles and interests in and to all properties, plants, machinery, equipment, inventories, goodwill, and other assets of every kind, character and description, whether tangible or intangible, whether real, personal or mixed, and wherever situated, owned, possessed, leased or licensed by any of Seller or its affiliates and used by Seller or its affiliates in the conduct of the Business, with such changes, deletions or additions thereto as may occur from the date hereof to the Closing in accordance with the terms and conditions of this Agreement and any Ancillary Agreement (as defined herein) executed in connection herewith, including, without limitation, each of the following assets (collectively, the "Assets"):

(a)     all properties, assets, rights and entitlements [reflected on the balance sheet as of **Date of Financial Review** (the "**Date of Financial Review**" Balance

Sheet") included in the Financial Statements (as defined in Section 5.16(a)) hereof)]
[included in the Final Closing Working Capital (as defined in Section 2.2 hereof)];

(b)     all real property used by the Business that is owned by Seller or its
affiliates, including those listed on Schedule 1.1(b), and all buildings, structures and other
improvements and fixtures located on such real property, and all easements, privileges,
rights-of-way, riparian and other water rights, lands underlying any adjacent streets or
roads, appurtenances, licenses, permits and other rights pertaining to or accruing to the
benefit of such real property, and any additions, improvements, replacements and
alterations thereto between the date hereof and the Closing Date (the "Owned Real
Property");

(c)     all leasehold interests in real property used by the Business,
including those listed on Schedule 1.1(c), including all buildings, structures

(d)     and other improvements located on such real property and any
additions, improvements, replacements and alterations thereto between the date hereof
and the Closing Date (the "Leased Real Property"; together with the Owned Real
Property, the "Real Property");

(e)     all tangible personal property and interests therein located or
customarily based on the Real Property used by the Business, including all machinery,
furniture, equipment, raw materials, supplies, spare and replacement parts, packaging
materials, vehicles, storage tanks, fuel and construction in progress and all warranties and
guarantees, if any, expressed or implied, existing for the benefit of Seller or its affiliates
in connection with any of the foregoing;

(f)     all inventory, work in progress and raw materials relating to the
Business, including any of such items in transit to or from manufacturing facilities or
warehouses of Seller or its affiliates (the "Inventory");

(g)     all accounts and notes receivable relating to the Business,
including intercompany receivables, deposits and advances, and other receivables (the
"Accounts Receivable");

(h)     all rights under all contracts, leases, licenses, commitments, sales
orders, purchase orders, invoices and other agreements relating to the Business and listed
on Schedule 1.1(g) (the "Assumed Contracts");

(i)     all warranties, claims and causes of action against third parties
relating to the Business or any of the Assets, except to the extent related to Excluded
Assets or Excluded Liabilities;

(j)     all security or other deposits, prepayments and prepaid expenses
relating to the Business or any of the Assets;

(k)     all federal, state and foreign intellectual property owned, licensed,
leased or used by the Business, including, without limitation: (i) (A) inventions,

2                                                  02/05/08 5:19 PM

technology, discoveries, processes, formulae, designs, methods, techniques, procedures, machines, manufactures, concepts, developments, new and useful improvements thereof and know-how relating thereto, whether or not patented or eligible for patent protection; (B) copyrights and copyrightable works, including computer applications, programs, software, databases, movies, films, and related items; (C) trademarks, service marks, trade names, trade dress, the goodwill of the Business symbolized thereby and appurtenant thereto, and all common-law rights relating thereto; and (D) trade secrets and other confidential or proprietary designs and information; (ii) all registrations, applications, recordings and licenses related to the foregoing; (iii) the right to obtain all renewals, reissues, divisions, continuations or other similar legal protections pertaining to the foregoing; and (iv) the right to sue at law or in equity for any infringement or misappropriation of, or impairment to the foregoing, including the right to receive all proceeds and damages therefrom (collectively, the "Intellectual Property");

(l)      originals or copies of all records, files, invoices, customer lists and all other information relating to existing or prospective customers of the Division or the Business, supplier lists, blueprints, specifications, designs, accounting books and records, tax books and records, business books and records, promotional or advertising material, operating data and plans, and all other relevant data relating to the Business (collectively, the "Books and Records"); provided that Seller shall retain originals of any such items which (x) relate primarily to the Excluded Assets or Excluded Liabilities; (y) are income tax books and records; or (z) are tax books and records (other than income tax) relating to taxes paid by Seller prior to the Closing; provided further that Buyer shall receive copies of the items set forth in clauses (x), (y) and (z) and Buyer shall receive originals of all other such items;

(m)      all federal, state, local, foreign and other governmental licenses, permits, approvals and authorizations relating to the Business to the extent transferable or assignable;

(n)      all insurance proceeds relating to the Business arising out of or related to damage, destruction or loss of any Assets to the extent of any damage or destruction that remains unrepaired, or to the extent any Assets remain unreplaced, as of the Closing;

(o)      all telephone numbers of the Division;

(p)      all goodwill associated with the Business, the Division or the Assets; and

(q)      all other properties and assets of Seller and its affiliates used in the conduct of the Business.

1.2      Excluded Assets.   There are no Excluded Assets.

1.3      Assignment of Assets; Consents.  (a)  To the extent that any lease, contract, license, agreement, sales or purchase order, commitment, property interest, qualification or other Asset to be sold, assigned, transferred or conveyed to Buyer, or any claim,

3                                    02/05/08 5:19 PM

right or benefit arising thereunder or resulting therefrom (the "Interests"), cannot be sold, assigned, transferred or conveyed to Buyer or used by Buyer in the conduct of the Business after the Closing without the obtaining of a Consent (as defined in Section 5.6), or to the extent that such sale, assignment, transfer, conveyance or use or attempted sale, assignment, transfer or conveyance of any such Interest would constitute a breach thereof or a violation of any law, decree, order, regulation or other governmental edict, this Agreement shall not constitute a sale, assignment, transfer or conveyance thereof or an attempted sale, assignment, transfer or conveyance thereof.

(b)     Seller, at Seller's own expense, shall obtain, prior to the Closing, all Consents, and Buyer will cooperate to obtain such Consents. Seller will provide Buyer with copies of each Consent promptly after it is obtained.

1.4     Further Assurances. At any time, whether before, at or after the Closing, the parties agree to cooperate with one another to execute and deliver such other documents, instruments of transfer or assignment, files, books and records and do all such further acts and things as may be reasonably required to consummate and make effective the transactions contemplated hereunder.

ARTICLE II

CONSIDERATION

2.1     Purchase Price. As consideration for the Assets and the covenant contained in Section 11.2 hereof, at the Closing Buyer pay Seller a number of shares of Buyer's Common Stock with an aggregate Buyer's Common Stock Value equal to Three Hundred Fifty Thousand Dollars ($350,000.00), $200,000.00 in cash and assumption of the Seller's liability attached hereto as Exhibit A; (payment is referred to as the "Base Purchase Price").

2.1(a)     For the purposes of this transaction, the parties agree that Buyer is presently valued at $750,000,000.00.

2.1(b)     In addition, Buyer shall employ David B. Lim as an employee for 6 years following Closing at $5,000.00 a month base salary with health benefits for him and his wife. David B. Lim shall execute the Buyer's standard employment agreement and such employment agreement shall replace this clause. Mr. David B. Lim shall be entitled to receive an option for a number of shares of Buyer's Common Stock with an aggregate Buyer's Common Stock Value equal to One Hundred Thousand Dollars ($100,000.00) in accordance with the terms in such employment agreement.

2.2     Allocation of Purchase Price. (a) Buyer and Seller agree that they shall allocate the sum of the Purchase Price among the Assets as of the Closing Date on Internal Revenue Service ("IRS") Form 8594, in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), and the Treasury regulations promulgated thereunder. The allocation described in the preceding sentence shall be determined by Buyer based upon the fair market value of the Assets as of the Closing Date. Buyer shall provide Seller with a copy of Buyer's proposed fair market value allocation (the "Allocation") as promptly as reasonably

practicable. All appropriate Seller comments, as determined by Buyer, will be made to the Allocation.

(b)     Buyer and Seller shall timely file with the appropriate Tax authorities copies of the agreed upon IRS Form 8594 and shall use the Allocation in the preparation of all Tax Returns (including any attachments thereto) and for all other Tax purposes. In the event any party hereto receives notice of an audit in respect of the Allocation, such party shall notify the other party in writing as to the date and subject of such audit as promptly as reasonably practicable.

(c)     If any Tax Return filed by Buyer or Seller relating to the transactions contemplated hereby is challenged by the Tax authority with which such Tax Return was filed on the basis of the Allocation, as finally adjusted, the filing party shall assert in good faith the validity and correctness of the Allocation, provided, however, that after asserting such position the filing party shall be free to settle such dispute as it determines. If any such Tax Return is challenged as herein described, the party filing such Tax Return shall keep the other party generally apprised of its decisions and the current status and progress of all administrative and judicial proceedings, if any, that are undertaken at the election of such party with respect thereto.

## ARTICLE III

### LIABILITIES, OBLIGATIONS AND INDEMNITIES

3.1     <u>Liabilities and Indemnity</u>.  Buyer is not assuming any liabilities, including the liabilities listed below(Excluded Liabilites), of Seller unless they are specifically assumed by Buyer in this Agreement:

(i)     any Liabilities relating to, pertaining to the Assets or the Business, or arising out of the operation of the Business with respect to periods, or portions thereof, ending on or prior to the Closing for all Taxes, all levies, imposts and duties in the nature of Taxes, and all deficiencies, assessments, charges and penalties associated therewith, including, but not limited to any Taxes arising in connection with the consummation of the transactions contemplated hereby;

(ii)     Liabilities relating to employee benefits or compensation arrangements arising before or as a result of the Closing, including, without limitation, any Liabilities under any Seller Plans (as defined in Section 5.15 hereof), including, without limitation, Liabilities relating to any severance payments or other benefits payable as a result of the transactions contemplated hereby, except as provided in Article X;

(iii)     Liabilities accruing prior to the Closing to the extent that Seller actually is reimbursed therefor under its insurance policies;

(iv)     Seller's payables and any other Liabilities to Seller's affiliates.

5

     (v)  Liabilities under any bond, note, debenture, or similar instrument or any other indebtedness for borrowed money;

     (vi)  any cash overdrafts;

     (vii)  Liabilities of Seller under this Agreement or any Ancillary Agreement;

     (viii)  Liabilities of Seller arising out of or as a consequence of (A) injury or death of any person as a consequence of any event occurring prior to the Closing, (B) damage to the property of any third party as a consequence of any event occurring prior to the Closing, and (C) workers' compensation claims relating to events or conditions which occurred or arose prior to the Closing;

     (ix)  Liabilities arising from any claim, action, suit, investigation or proceeding (whether initiated prior to or after Closing) relating to or arising out of Seller's ownership of the Assets or Seller's conduct of the Business prior to the Closing, including, without limitation, claims with respect to defective products or services, alleged improper sales practices, warranty claims, claims for any loss, damage or cost arising out of any property damage or personal injury due to the use of any product sold by or services furnished by the Business prior to the Closing;

     (x)  Liabilities under or relating to Environmental Laws arising out of or as a consequence of an event or condition occurring or existing prior to the Closing;

     (xi)  Liabilities resulting from or relating to Seller's failure to qualify to do business as a foreign corporation in any jurisdiction;

     (xii)  any Liabilities which are satisfied or discharged prior to the Closing;

     (xiii)  any Liability of any other division or business of Seller or any affiliate of Seller; and

     (xiv)  any obligations or liabilities arising out of or relating to all claims and causes of action under federal, state and/or municipal civil rights and/or employment law statutes including, but without limitation, Title VII of the Civil Rights Acts of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Fair Labor Standards Act, the Occupational Health & Safety Act or the National Labor Relations Act for actions of Seller arising prior to the Closing.

     (b)  Seller hereby agrees to indemnify and hold harmless Buyer and its affiliates and their respective directors, shareholders, partners, officers, employees, agents, consultants, representatives, successors, transferees and assigns (hereinafter sometimes referred to as "Buyer Indemnified Parties") against (i) any Excluded Liabilities (including in each case any penalties, fines, reasonable attorneys' fees and disbursements and other costs incident to proceedings or investigations or the prosecution or defense of any claim (collectively,

                02/05/08 5:19 PM

"Damages")) and (ii) any Damages that are caused by or arise out of the failure by Seller to perform or fulfill any agreement or covenant to be performed or fulfilled by Seller or any of its affiliates under this Agreement or any Ancillary Agreement.

(c)    Buyer shall indemnify and hold harmless the Seller Indemnified Parties against any Damages that are caused by or arise out of the failure by Buyer to perform or fulfill any agreement or covenant to be performed or fulfilled by Buyer under this Agreement or any Ancillary Agreement.

(d)    Any indemnification amounts payable to Buyer Indemnified Parties or Seller Indemnified Parties hereunder shall be paid them by wire transfer of immediately available funds.

3.2    Indemnification Procedure. The obligation of a party (the "Indemnifying Party") to indemnify any person or entity (the "Indemnified Party") under Section 3.1 hereof is conditioned upon receiving from the Indemnified Party written notice of the assertion or institution of a claim arising from or related to any liability set forth in Section 3.1 hereof (a "Claim") or of the occurrence of an event which the Indemnified Party reasonably believes could lead to the assertion of a Claim, promptly after the Indemnified Party becomes aware of such Claim or event; provided, however, that the failure of the Indemnifying Party to receive such notice on a timely basis shall not relieve the Indemnifying Party of its obligation to indemnify hereunder. Subject to the terms hereof, the Indemnifying Party shall have the right, in its sole discretion and at its sole expense, to elect to assume the defense of any Claim with legal counsel of its own selection reasonably satisfactory to the Indemnified Party; provided, however, that no Claim may be settled by the Indemnifying Party without the consent of the Indemnified Party, which consent shall not be unreasonably withheld. If the Indemnifying Party elects to assume the defense of any Claim, the Indemnified Party shall have the right, but not the obligation, to participate, at its own expense, in the defense of such Claim through counsel of its own and the fees and expenses of such counsel will be at the expense of such Indemnified Party unless (i) the Indemnifying Party specifically authorized the employment of such counsel and specifically agreed to pay such counsel's fees, (ii) the Indemnifying Party does not employ counsel that is reasonably satisfactory to the Indemnified Party, (iii) in the judgment of the Indemnified Party, there is an actual or potential conflict of interest between the position of the Indemnifying Party on the one hand and the Indemnified Party on the other hand, or (iv) the Indemnifying Party fails to assume the defense or fails to contest such action in good faith. In the event the Indemnifying Party fails timely to defend, contest or otherwise protect against any Claim in good faith, the Indemnified Party shall have the right, but not the obligation, to defend, contest, assert cross claims or counterclaims or otherwise protect against the same, to make any compromise or settlement thereof, and to recover from the Indemnifying Party and be indemnified by the Indemnifying Party for the entire cost thereof, including, without limitation, legal expenses, disbursements and all amounts paid as a result of such Claim or the compromise or settlement thereof. Seller and Buyer each agree to render to each other such assistance as may reasonably be requested in order to insure the proper and adequate defense of any such claim or proceeding.

02/05/08 5:19 PM

ARTICLE IV

CLOSING

4.1     Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Law Offices of Young K. Park, 2009 Chestnut Street, Philadelphia, PA 19103 as soon as practicable after all the conditions to Closing set forth in Article VIII hereof shall be satisfied or duly waived, or at such other time and place as Buyer and Seller may mutually agree. The date on which the Closing occurs shall be referred to herein as the "Closing Date."

4.2     Seller's Closing Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a)     Executed bills of sale and assignments in recordable form for each jurisdiction in which Assets are located, each in form and substance reasonably satisfactory to Buyer;

(b)     Executed and acknowledged assignments, each in form and substance reasonably satisfactory to Buyer, with respect to all Intellectual Property identified in Schedule 5.13(a) or described in Section 1.1(j) hereof;

(c)     Executed copy of each document of transfer required of Seller with respect to the permits and licenses to be assigned or transferred at Closing, each in form and substance reasonably satisfactory to Buyer;

(d)     Special warranty deeds (or equivalent) in recordable form, each in form and substance reasonably satisfactory to Buyer and sufficient to convey to Buyer all of Seller's interest in the Owned Real Property free and clear of all Encumbrances, except for Permitted Encumbrances (as defined in Section 5.3);

(e)     With respect to each parcel of Owned Real Property, an owner's title insurance policy or binding marked commitment therefor issued by a title insurance company reasonably satisfactory to Buyer insuring the fee simple title to such property, subject only to Permitted Encumbrances;

(f)     Such other instruments of sale, transfer, conveyance and assignment, each in form and substance reasonably satisfactory to Buyer, as shall be effective to vest in Buyer good title, rights and interest to the Assets (the instruments referred to in Sections 4.2(a), 4.2(b), 4.2(c), 4.2(d), 4.2(e), 4.2(f) and 4.3(b) being collectively referred to herein as the "Assignment and Assumption Instruments") and such other documents to facilitate the transfer of the Real Property and the obtaining of title insurance by Buyer as Buyer may reasonably request;

(g)     Certified copy of the resolutions of Seller's Board of Directors evidencing the authorizations set forth in Section 5.2 hereof;

8

          (h)      Executed copy of (i) the Transition Services Agreement substantially in the form attached hereto as Exhibit 4.2 (h)(i); and (ii) [the Trademark License Agreement substantially in the form attached hereto as Exhibit 4.2(h)(ii)] (collectively, together with the Assignment and Assumption Instruments, the "Ancillary Agreements").

          (i)      Written receipt executed by Seller of payment of the Base Purchase Price;

          (j)      All Books and Records (other than the Books and Records located on the Real Property on the Closing Date which are customarily located on the Real Property);

          (k)      Copies of all approvals, Consents or authorizations obtained as of the Closing Date;

          (l)      Certificate of the President of Seller that the conditions set forth in Sections 8.2(c) and 8.2(d) hereof have been satisfied; and

          (m)      A certificate duly executed by the Seller and in a form reasonably satisfactory to Buyer, certifying that the transactions contemplated herein are exempt from withholding under Section 1445 of the Internal Revenue Code of 1986, as amended.

        4.3      <u>Buyer's Closing Deliveries</u>.  At the Closing, Buyer shall deliver or cause to be delivered to Seller:

          (a)      The Base Purchase Price;

          (b)      Certified copy of the resolutions of Buyer's Board of Directors evidencing the authorization set forth in Section 6.2 hereof; and

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES
### OF SELLER

Seller hereby represents and warrants to Buyer that:

        5.1      <u>Organization and Corporate Power</u>.  (a)  Seller is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware.  Seller has all requisite power and authority to own, lease and operate the Assets and to conduct the Business.  Seller has full corporate power and authority to enter into and perform this Agreement and each Ancillary Agreement.

          (b)      Seller and each affiliate of Seller has all requisite power and authority to enter into and perform any Ancillary Agreements to which Seller and such affiliate is a party.

02/05/08 5:19 PM

5.2    Due Authorization; No Breach.  (a)  The execution, delivery and performance by Seller of this Agreement and by Seller and its affiliates of each Ancillary Agreement to which Seller or such affiliate is a party and the transactions contemplated hereby and thereby have been approved by the Board of Directors of each of Seller and Seller's relevant affiliates and no further action is required to be taken by any of Seller and such affiliates in order to execute, deliver and perform this Agreement and any of the Ancillary Agreements to which Seller or such affiliate is a party and to transfer the Assets to Buyer.  This Agreement is a valid and legally binding obligation of Seller, enforceable against it in accordance with its terms, and each Ancillary Agreement and other agreement or instrument contemplated by this Agreement, when executed and delivered by any of Seller or its affiliates in accordance with the provisions thereof, will be a valid and legally binding obligation of each of Seller and any affiliate that is a party thereto, enforceable against each such party in accordance with its terms.  All persons who have executed this Agreement on behalf of Seller, or who will execute on behalf of Seller or any affiliate of Seller, any agreement or instrument contemplated by this Agreement, have been duly authorized to do so by all necessary corporate action.

(b)    Neither the execution and delivery of this Agreement, any Ancillary Agreement to which Seller or any affiliate of Seller is a party and the other agreements and documents to be executed or delivered pursuant hereto, nor the consummation of the transactions contemplated hereby and thereby, will (i) violate, or conflict with, any provision of the certificate of incorporation or by-laws (or other governing documents) of Seller or any of its affiliates, (ii) violate, or conflict with, or result in a breach of any provision of, or constitute a default (or an event of default which with notice or lapse of time or both would become a default) under, or result in the termination (or grant a right of termination) of, cancellation, amendment or accelerate (or grant the right to accelerate) the performance required by, or result in the creation of any lien, security interest, charge or encumbrance upon any of the Assets under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, agreement, lease, Permit (as defined in Section 5.8) or other material instrument to which Seller or any of its affiliates is a party or by which any of them or any of the Assets are bound or (iii) violate, or conflict with, any order, writ, injunction, arbitration award, judgment or decree of any court, governmental body or arbitrator applicable to Seller or any applicable statute, law, rule or regulation, except, in the case of clause (ii) or (iii), as would not, individually or in the aggregate, reasonably be expected to result in a material adverse effect on the business, condition (financial or otherwise), results of operations [or prospects] of the Division, the Business or the Assets or have a material adverse effect on the ability of any of Seller and its affiliates to perform Seller's and such affiliates' obligations hereunder or under any Ancillary Agreement (each of such effects is herein called a "Material Adverse Effect").

5.3    Real Property.  (a)  Schedule 1.1(b) hereto is a true and complete list of all real property owned by Seller or its affiliates and used in the conduct of the Business.  Legal descriptions of each Owned Real Property and the most recent title reports or policies with respect to each Owned Real Property have previously been delivered to Buyer.  Seller is (and at Closing Buyer shall be) the sole owner of good, valid, fee simple, indefeasible, sufficient and marketable title to the Owned Real Property, including, without limitation, all easements or rights of ways granted to Seller or its affiliates and all buildings, structures, fixtures, and improvements located thereon, in each case free and clear of all pledges, security interests, liens, mortgages, encumbrances, equities, claims, reservations, third party rights or obligations

02/05/08 5:19 PM

(including, without limitation, third party leases or subleases, easements, rights of way or other commercial or governmental use restrictions) of any nature (collectively, "Encumbrances"), except (i) as expressly set forth on Schedule 5.3(a), (ii) liens for current taxes not yet due and payable or being contested in good faith by appropriate proceedings (all such taxes under contest being listed in Schedule 5.3(a)(ii)), (iii) imperfections of title, easements, pledges, charges and encumbrances, if any, that do not in the aggregate materially detract from the value or materially interfere with the present use of any of the Assets or otherwise materially interfere with the business of the Division, and (iv) Encumbrances created by, or arising as a result of the ownership of the Assets by, Buyer (clauses (i), (ii), (iii) and (iv), collectively, the "Permitted Encumbrances"). There are no brokerage or leasing commissions pertaining to the Owned Real Property that have not been fully paid.

(b)     Schedule 1.1(c) hereto is a true and complete list of all agreements (together with any amendments thereof, collectively, the "Real Property Leases") pursuant to which Seller or its affiliates leases, subleases or otherwise occupies (whether as landlord, tenant, subtenant or other occupancy arrangement) any real property included in the Assets, and true and complete copies of the Real Property Leases have previously been delivered to Buyer. With respect to each Real Property Lease, except as set forth on Schedule 5.3(b), (i) such Real Property Lease is a valid and subsisting agreement in full force and effect and constitutes a valid and binding obligation of Seller or its affiliates and, to Seller's knowledge, of any other party thereto, and is legally enforceable against Seller or its affiliates and, to Seller's knowledge, any other party thereto, (ii) such Real Property Lease may be assigned by Seller or its affiliates without the consent of any other party and without resulting in an increase in rent or penalty to the tenant or an early termination, (iii) each of Seller and its affiliates has not received any written notice from the other party to such lease of the termination thereof or alleging a default by Seller or its affiliates, (iv) there is no material default or event which, with notice or lapse of time or both, would constitute a material default on the part of Seller or its affiliates (nor, to Seller's knowledge, on the part of any other party thereto) under any such lease, (v) Seller or its affiliates has not transferred, assigned, hypothecated, pledged or encumbered any of its rights or interest thereunder, and (vi) Seller or its affiliates have, and immediately after the Closing, Buyer will have, good, valid and enforceable title to the leasehold estate in the Leased Real Property, free and clear of any Encumbrance of any nature, except for the Permitted Encumbrances.

(c)     Seller has obtained all easements and rights of way required from all governmental jurisdictions or from private parties for the normal use and operation of the Business on the Real Property as heretofore conducted.

(d)     There is no pending or, to Seller's knowledge, threatened condemnation, expropriation, eminent domain or similar proceeding affecting any of the Real Property and Seller has not received any written notice of any of the same.

(e)     Each Real Property and all buildings, structures, fixtures and improvements on each Real Property, and all use of any thereof by Seller or its affiliates, conform in all material respects with all applicable building, zoning, subdivision, land use, fire and other laws pertaining to or affecting real property. Each occupied Real Property is occupied under a valid and existing certificate of occupancy for such Real Property. Seller has taken all corrective action indicated in all written notices or orders to Seller or its affiliates to correct

11                                                    02/05/08 5:19 PM

violations of laws issued by any governmental authority having jurisdiction against or affecting the Real Property. No Real Property is in violation of any restrictive covenant, condition, restriction or limitation that would reasonably be expected to have a material adverse effect on the use thereof as currently utilized.

(f)    No Real Property is subject to any contract or other restriction of any nature whatsoever (recorded or unrecorded) (other than the Real Property Leases) preventing or limiting the right of Seller or its affiliates to convey or use it as currently operated.

(g)    All Real Property and the improvements thereon are supplied with the utilities necessary for the operation of such facilities as currently operated.

(h)    Each of Seller and its affiliates have not received written notice of any special assessment relating to any Real Property or any portion thereof, and, to Seller's knowledge, there are no pending or threatened special assessments.

(i)    Seller has furnished Buyer with all environmental, engineering or other studies or reports prepared for Seller or its affiliates since founding of the Seller that primarily deal with the ownership, operation, maintenance or management of the Real Property.

5.4    Personal Property. (a) Except as disclosed in Schedule 5.4 and except for dispositions of assets after the date hereof and prior to the Closing in accordance with the terms of this Agreement, all of the fixtures, plants, buildings, improvements, machinery, equipment, vehicles, construction in progress and other tangible personal property referred to in Sections 1.1(d) and 1.1(e) hereof are located on the Real Property. Except for goods in transit and as disclosed in Schedule 5.4, all of the Inventory is located on the Real Property. Schedule 5.4 sets forth a true and complete list of (i) all tangible personal property included in the Assets having a net book value of greater than $100.00, and (ii) all tangible personal property included in the Assets requiring specific documents of transfer in order to effectively transfer title thereto from Seller or its affiliate to Buyer, together with a brief description of the documents required.

(b)    All of the fixtures, plants, buildings, structures and improvements on the Real Property and all machinery, equipment, vehicles and other tangible personal property included in the Assets have no material defects, are in normal operating condition and repair, except for immaterial exceptions, and have been reasonably maintained consistent with standards generally followed in the industry (giving due account to the age and length of use of same, ordinary wear and tear excepted).

5.5    Title and Condition of Assets; Entire Business. (a) Seller or its affiliates have good and marketable title to, or hold by valid and existing lease or license, all of the Assets and will transfer same to Buyer at the Closing. The Assets are free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)    The Assets, together with the rights of Buyer under the Ancillary Agreements, are sufficient to allow Buyer to conduct the Business substantially in the same manner and to substantially the same extent as heretofore conducted by Seller and its affiliates.

02/05/08 5:19 PM

5.6     Consents.  Schedule 5.6 hereto sets forth all actions, approvals, permits, consents or authorizations, including but not limited to any action, approval, consent or authorization by any third party, financial institution, governmental or quasi-governmental agency, commission, board, bureau or instrumentality, required to be obtained by any of Seller and its affiliates in order to consummate the transactions contemplated hereby or in order for Buyer to continue the conduct of the Business after the Closing, including consents required to transfer or assign any Contracts or Permits to Buyer. All of the consents referred to in the preceding sentence are hereby collectively referred to as the "Consents."

5.7     Compliance With Laws.  Except as set forth in Schedule 5.7 hereto, each of Seller and its affiliates are not, with respect to the conduct of the Business or the use of the Assets, in default under or in violation of any federal, state, local or foreign statute, law, ordinance, regulation, rule, judgment, order or decree that would reasonably be expected to give rise to a material liability.

5.8     Permits and Licenses.  Schedule 5.8 hereto sets forth all governmental licenses, permits, franchises and other governmental authorizations (collectively "Permits") that are issued to, held or used in relation to the Business by Seller and its affiliates or for which Seller or its affiliates have applied, including the dates of issuance and expiration or of application as the case may be, and there are no other governmental licenses, permits, franchises or authorizations that are material to the Business. True and complete copies of all Permits set forth on Schedule 5.8 have been previously delivered to Buyer. Except as set forth on Schedule 5.8 hereto, Seller and its affiliates have not received any written warning, notice of violation or probable violation, notice of revocation or other written communication from or on behalf of any governmental entity, which violation has not been corrected or otherwise settled, alleging (i) any material violation of any Permit relating to the Division, (ii) that Seller or its affiliate needs a Permit material to the Business not currently held by Seller or an affiliate in order to conduct the Business or (iii) any current violation, with respect to the conduct of the Business or the use of the Assets, of any federal, state, local or foreign laws, ordinances, regulations or orders.

5.9     Environmental Conditions.  Except as disclosed on Schedule 5.9, in connection with the Business, the Assets or the Division:

(a)     Seller or its affiliates hold, and are in compliance with, all Environmental Permits (as defined below) and are otherwise in compliance with all applicable Environmental Laws (as defined below), except for such failures to be in compliance which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. Except as identified on Schedule 5.9(a) hereto, no modification, revocation, reissuance, alteration, transfer, or amendment of the Environmental Permits, or any review by, or approval of, any third party of the Environmental Permits is required in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby or the continuation of the Business following such consummation assuming the Business is conducted as heretofore conducted. To Seller's knowledge, there is no condition that could prevent or interfere with continued material compliance with Environmental Laws, assuming the Business continues to be conducted as presently conducted and the Assets used as presently used. For purposes of this Agreement, "Environmental Permits" shall mean all permits, licenses,

13                                    02/05/08 5:19 PM

registrations and other governmental authorizations required under Environmental Laws for the conduct of the Business and "Environmental Laws" shall mean any and all foreign, federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any governmental authority, or requirements of law (including, without limitation, common law) relating in any manner to contamination, pollution, or protection of the environment.

(b)    Seller and its affiliates have not received any written notice of any Environmental Claim (as hereinafter defined) and, to Seller's knowledge, no such Environmental Claim is, or has been threatened.  For purposes of this Agreement, "Environmental Claim" means any notice, claim, demand, action, suit, complaint, proceeding or other communication by any third person alleging liability or potential liability (including, without limitation, liability or potential liability for investigatory costs, cleanup costs, governmental response costs, natural resource damages, property damage, personal injury, fines or penalties) arising out of, relating to, based on or resulting from (x) the presence, discharge, emission, release or threatened release of any Hazardous Materials (as hereinafter defined) at any location, or (y) circumstances forming the basis of any violation by Seller or its affiliates of any Environmental Laws, including, but not limited to, any violations by Seller or its affiliates of any applicable Environmental Permits, in each case which would reasonably be expected to result in material liability under Environmental Laws.  For purposes of this Agreement, "Hazardous Materials" means any and all hazardous or toxic substances, wastes, materials or chemicals, petroleum (including crude oil or any fraction thereof) and petroleum products, asbestos and asbestos-containing materials, pollutants, contaminants, polychlorinated biphenyls and any and all other materials and substances regulated pursuant to any Environmental Laws or that could result in the imposition of material liability under any Environmental Laws.

(c)    Seller and its affiliates have not entered into, have not agreed to, and have not received any written notice that it or they are subject to, any judgment, decree or order of any governmental authority under any Environmental Laws, including, without limitation, relating to compliance or to investigation, cleanup, remediation or removal of Hazardous Materials.

(d)    Hazardous Materials have not been generated, transported, treated, stored, disposed of, arranged to be disposed of, released or threatened to be released at, on, from or under any of the Assets in violation of, or in a manner or to a location that would reasonably be expected to give rise to material liability relating to the Business under, any Environmental Laws.

(e)    There are no (r) underground or aboveground storage tanks, (s) polychlorinated biphenyls, (t) asbestos or asbestos-containing materials, (u) Hazardous Materials, (v) urea-formaldehyde insulation, (w) sumps, (x) surface impoundments, (y) landfills or (z) sewer or septic systems currently or formerly present at or about any of the Assets which constitute a violation of any Environmental Law would reasonably be expected to give rise to material liability under any Environmental Laws.

02/05/08 5:19 PM

(f)      Seller and its affiliates have not assumed, contractually or by operation of law, any liabilities or obligations of third parties under any Environmental Laws that concern the Business.

5.10      Product Safety.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each of the products produced or sold by Seller or its affiliates in connection with the Business is, and at all times up to and including the sale thereof has been, in compliance in all respects with all applicable federal, state, local and foreign laws and regulations relating to safety. Sellers and its affiliates have not been required by any governmental agency to make, or have they voluntarily undertaken, any product recall, and there is no such action pending or, to Seller's knowledge, threatened by any governmental body against Seller or its affiliates relating to any products of the Division or the Business. There have been no reported incidents of tampering with products of the Division or the Business.

5.11      Employee Relations.  Except as disclosed in Schedule 5.11 hereto, Seller and its affiliates do not have any agreements with labor unions or associations representing any employees of the Division. There are no oral or written contracts of employment between Seller and any employees that are not terminable at will without liability or penalty. There is neither pending nor, to Seller's knowledge, threatened any strike, slowdown, picketing, work stoppage or labor trouble or other occurrence, event or condition of a similar character in which the employees of the Division are participating or, to Seller's knowledge, have threatened to participate, and the Division has not experienced such labor controversy.  There is no material unfair labor practice charge or complaint pending or, to Seller's knowledge, threatened against the Division. No representation question exists or has been raised, respecting any of the Division's employees nor to Seller's knowledge are there any campaigns being conducted to solicit cards from employees of the Division to authorize representation by any labor organization. Seller or its affiliates have paid in full to all employees of the Division all wages, salaries, commissions, bonuses, benefits and other compensation which are required to be paid to such employees or otherwise arising under any policy, practice, agreement, plan, program, statute or other law.  Neither Seller nor its affiliates have closed any plant or facility of the Division, effectuated any layoffs of employees of the Division at a single employment site during any 30-day period for at least **two(2)** percent of the employees or at least **three(3)** employees (whichever is less), or implemented any early retirement, separation or window program applicable to employees of the Division since January 1, 2005, nor have they planned or announced any such action or program for the future relating to the Division.  Seller and its affiliates are in compliance with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 and all other notification and bargaining obligations arising under any collective bargaining agreement, statute or otherwise relating to the Division.

5.12      Litigation, Claims and Proceedings.  Except as set forth on Schedule 5.12 hereto, there are no judgments, orders, writs or injunctions of any foreign, federal, state or local court or governmental authority presently pending or, to Seller's knowledge, threatened against Seller or its affiliates relating to the Business or by which the Assets are or would be bound, and there are no lawsuits, actions, arbitrations, claims, governmental proceedings or notices of

violation presently pending or, to Seller's knowledge, threatened to which Seller or an affiliate is a party (as plaintiff, defendant or otherwise) which relate to the Business. Except as set forth on Schedule 5.12 hereto, there are no facts that could reasonably be expected to give rise to any action, suit, proceeding, inquiry or investigation that could, if adversely decided, individually or in the aggregate, have a Material Adverse Effect.

        5.13    Intellectual Property. (a) Schedule 5.13(a) hereto sets forth all Intellectual Property owned or used by Seller or its affiliates in the conduct of the Business as heretofore conducted and the nature of Seller's or such affiliates' rights therein. For all Intellectual Property owned by a third party and used by Seller or its affiliates in the conduct of the Business pursuant to a license or other agreement, all such licenses or agreements are in force and assignable to Buyer. If specific disclosure on Schedule 5.13(a) would jeopardize or impair the value or validity of any Intellectual Property, such Intellectual Property is described generally thereon.

        (b)    Except as set forth on Schedule 5.13(b), (i) Seller or its affiliates own or have a valid license to use all Intellectual Property necessary to conduct the Business and such Intellectual Property is valid, subsisting, unexpired, enforceable, free of all Encumbrances, has not been abandoned by Seller or its affiliates, and does not infringe or otherwise impair the intellectual property rights of any third party; (ii) none of the Intellectual Property owned or used by the Division is the subject of any license, security interest or other agreement granting rights therein from Seller or its affiliates to any third party; (iii) no judgment, decree, injunction, order or agreement is in effect which would limit, cancel or question the validity of, or Seller's or its affiliates' rights in and to, any Intellectual Property used in the conduct of the Business; and (iv) no suit, action, proceeding or investigation is pending or, to Seller's knowledge, threatened that seeks to limit, cancel or question the validity of, or Seller's or such affiliates' rights in and to, any Intellectual Property used in the conduct of the Business.

        (c)    Seller specifically warrants that the Assets (i) contain all Intellectual Property for which improper or unauthorized disclosure would jeopardize or impair its value or validity ("Trade Secrets") owned, possessed, licensed and/or used by Seller or its affiliates in the conduct of the Business and (ii) constitute all those Trade Secrets necessary to conduct the Business as heretofore conducted. Except as set forth on Schedule 5.13(c), Seller is the owner of all Trade Secrets used in the conduct of the Business, and where Seller does not own any Trade Secret, Seller is the licensee thereof and all applicable license agreements are in force and assignable to Buyer.

        5.14    Contracts. (a) Schedule 5.14 hereto lists as of the date hereof all written contracts, agreements, commitments and personal property leases and includes summaries of all oral arrangements that relate to the Assets, the Division or the Business and, with respect to both oral and written arrangements, that meet the criteria specified in the paragraphs below:

        (i)    involve future expenditures or receipts or other performance with respect to goods or services having a total value in excess of $5,000.00;

02/05/08 5:19 PM

(ii)    involve a lease, sublease, installment purchase or similar arrangement for the use of property which involves a total consideration in excess of $2,000.00;

(iii)    contain any severance pay obligations or payments to employees due as a result of the consummation of the transactions contemplated hereby;

(iv)    compel the employment of any person in the status of "employee";

(v)    involve a consulting relationship which involves total consideration in excess of $3,000.00 during the term of such agreement;

(vi)    any agreement with or for the benefit of any affiliate of Seller;

(vii)    involves the handling, treatment, storage, transportation, recycling, reclamation or disposal of wastes or substances except for oral arrangements with suppliers that are not material;

(viii)    contain commitments of suretyship, guaranty or indemnification (except for guarantees, warranties and indemnities provided by Seller or its affiliates in respect of its products in the ordinary course of business);

(ix)    involve the development of any of the Real Property or provide for improvements thereto;

(x)    relate to the disposition or acquisition since [Date] of the assets or stock of, or any interest in, any business enterprise;

(xi)    involve payments to or by Seller or its affiliates in respect of the Business over the term in excess of $3,000.00 or which may not be terminated on 60 days or less notice without penalty;

(xii)    limits or could limit the freedom of Seller or its affiliates to compete in any line of business or with any person or in any area or to own, operate, sell, transfer, pledge or otherwise dispose of or encumber any of their properties or assets, tangible and intangible, real or personal, related to the Assets, the Division or the Business, or could so limit the freedom of the Buyer or its affiliates after the Closing;

(xiii)    contain an indenture, mortgage, pledge, credit (other than credit terms offered to customers in the ordinary course of business), or other financing commitment for the borrowing or lending of funds from or to any person; or

(xiv)    is otherwise material to the Assets, the Division or the Business.

17                                                          02/05/08 5:19 PM

(b)    Except as otherwise indicated in any Schedule hereto, with respect to the contracts listed in Section 5.14(a) above, (i) Seller and its affiliates are not in default of any material obligation under any of such contracts, (ii) to Seller's knowledge, no other party to any of such contracts is in default of any material obligation thereunder and (iii) there does not exist under any provision thereof any event that, with the giving of notice or the lapse of time or both, would constitute a material default thereunder. True and correct copies of all items listed on Schedule 5.14 have been previously delivered to Buyer. The Contracts to be assigned to Buyer pursuant to this Agreement are adequate and appropriate for the conduct of the Business as conducted in the ordinary course.

5.15    Benefit Plans.  (a)  Schedule 5.15 contains a true and complete list of each "employee benefit plan" of Seller or its affiliates (within the meaning of section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (including, without limitation, multiemployer plans within the meaning of ERISA Section 3(37)), stock purchase, stock option, severance, employment, change-in-control, fringe benefit, collective bargaining, bonus, incentive, deferred compensation and all other employee benefit plans, agreements, programs, policies or other arrangements, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise), whether formal or informal, oral or written, legally binding or not under which any employee or former employee of the Division has any present or future right to benefits or under which Seller or its affiliates have any present or future liability which relate to the Division. All such plans, agreements, programs, policies and arrangements shall be collectively referred to as the "Seller Plans."

(b)    With respect to each Seller Plan, Seller has delivered or caused to be delivered to the Buyer or its representative a current, accurate and complete copy (or, to the extent no such copy exists, an accurate description) thereof and, to the extent applicable, (i) any related trust agreement, annuity contract or other funding instrument; (ii) the most recent determination letter if applicable; (iii) any summary plan description and other written communications (or a description of any oral communications) by the Seller or its affiliates to their employees concerning the extent of the benefits provided under a Seller Plan; and (iv) for the three most recent years (I) the Form 5500 and attached schedules; (II) audited financial statements; (III) actuarial valuation reports; and (IV) attorney's response to an auditor's request for information.

(c)    (i) Each Seller Plan has been established and administered in accordance with its terms, and in compliance in all material respects with the applicable provisions of ERISA, the Code and other applicable laws, rules and regulations; and (ii) each Seller Plan that is intended to be qualified within the meaning of Code section 401(a) is so qualified and has received a favorable determination letter as to its qualification and nothing has occurred, whether by action or failure to act, that could reasonably be expected to cause the loss of such qualification.

(d)    Seller or its affiliates are not a party to, or obligated to contribute to, any multiemployer plan (within the meaning of ERISA section 4001(a)(3)) with respect to the employees of the Division.

02/05/08 5:19 PM

5.16    Financial Statements. (a)  Attached hereto as Schedule 5.16 are (i) the audited balance sheet of the Business as of [fiscal year-end date] and the related audited statement of operations and statement of cash flows for the Business for the fiscal year ended [fiscal year-end date] and (ii) the unaudited balance sheet of the Business as of [interim period-end date] and the related unaudited statement of operations and unaudited statement of cash flows for the Business for the 8 months ended **December 31, 2007** (collectively, clauses (i) and (ii) are referred to herein as the "Financial Statements"). The Financial Statements present fairly in all material respects the financial position and results of operations of the Business as of the date or for the periods set forth therein (subject, in the case of the unaudited Financial Statements, to changes resulting from normal year-end audit adjustments not in the aggregate material) and were prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied during the periods set forth therein.

(b)    Except (i) as reflected, reserved against or otherwise expressly disclosed in the Financial Statements or (ii) for liabilities, obligations or changes in assets incurred in the ordinary course of business in accordance with the provisions of this Agreement, since [fiscal year-end date], the Business has not had and will not have any liabilities, obligations or change in assets that would be required to be reflected on a balance sheet for the Business prepared in accordance with GAAP consistently applied during the period set forth therein.

(c)    The accounts and notes receivable of the Business, including intercompany receivables, reflected on the Financial Statements and the accounts and notes receivable arising thereafter and prior to the Closing represent and will represent valid claims, arising from bona fide transactions incurred in the ordinary course of business and consistent with past practice, and no counterclaims or offsetting claims with respect to such receivables shall be pending or, to the Seller's knowledge, threatened other than customer credits arising in the ordinary course of business and consistent with past practice. Such accounts and notes receivable are and will be current and fully collectible, less the applicable reserves for returns and doubtful accounts. The accounts payable of the Business reflected on the Financial Statements and all accounts payable arising thereafter and prior to the Closing arose and will arise from valid transactions incurred in the ordinary course of business and consistent with past practice, and have been paid or are not yet due and payable.

(d)    The inventories reflected on the Financial Statements (except the inventories which have been sold or disposed of in the ordinary course of business since the dates thereof and except for excess and obsolete inventory which has been written off consistent with the Seller's established accounting practices with respect to the Business) and the inventories thereafter acquired or manufactured in connection with the Business and not subsequently sold or disposed of in the ordinary course of business do, and the inventories as of the Closing Date will, consist of items of a quality and quantity which in the aggregate are (i) usable in the ordinary course of the Business or (ii) saleable in the ordinary course of the Business at net realizable values (i.e., normal selling price less all applicable discounts, commissions and shipping costs) not less than their respective book value amounts. Inventory on the Financial Statements is, and Inventory as of the Closing Date will be, except for obsolete and below-standard quality inventory described below, stated at the lower of cost (determined by the FIFO method) or market in accordance with GAAP, consistently applied. The value of excess and obsolete inventory and inventory of below standard quality reflected on the Financial

02/05/08 5:19 PM

Statements has been, and as of the Closing Date will be, written down to net realizable marketable value or written off or adequate reserves in accordance with GAAP, consistently applied, have been provided therefor. The inventory on hand is, and as of the Closing Date will be, at levels consistent with expected customer demand and consistent with past practice. Since the date of the Financial Statements, the volumes and purchases of inventories and orders therefore have not been reduced, increased or otherwise modified in anticipation of the transactions contemplated by this Agreement.

      5.17    <u>Absence of Certain Changes or Events</u>. Except as set forth in Schedule 5.17 hereto, since [fiscal year-end date], the Business has been conducted only in the ordinary course consistent with past practice and there has not been:

        (a)    any event, occurrence or state of circumstances or facts which has resulted in, or would reasonably be expected to result in, a Material Adverse Effect;

        (b)    any material damage, destruction or loss of any of the Assets, whether or not covered by insurance;

        (c)    any acquisition or lease (other than a renewal of an existing lease in the ordinary course of business) of any material asset or property relating to the Division or the Business;

        (d)    any disposition by Seller of any material assets relating to the Business (other than disposition of inventory for fair consideration and in the ordinary course of business consistent with past practice);

        (e)    any increase in, or commitment or plan adopted to increase, the wages, salaries, compensation, pension or other benefits or payments to employees of the Division;

        (f)    any change in accounting methods, principles or practices relating to the Division except for any such change required by reason of a concurrent change in generally accepted accounting principles;

        (g)    any liability or obligation created or incurred, except for liabilities or obligations incurred in the ordinary course of business consistent with past practice and that would not reasonably be expected to have a Material Adverse Effect;

        (h)    any Encumbrance (other than a Permitted Encumbrance) created on any Asset;

        (i)    any capital expenditure commitment in excess of $5,000.00, with respect to the Assets, the Division or the Business or as to which Buyer will become obligated to assume after the Closing;

        (j)    any cancellation or compromise of any debt or claim relating to any Asset, the Division or the Business;

02/05/08 5:19 PM

(k)     any condemnation proceedings commenced or concluded with respect to any Asset or any notice received by Seller as to the proposed commencement of any such proceedings;

(l)     any waiver by the Seller or its affiliates of any rights of substantial value with respect to the Assets, the Division or the Business;

(m)     any entry into any collective bargaining agreement or, through negotiation or otherwise, the incurrence of any commitment or liability to any labor organization with respect to employees of Seller or its affiliates employed in the Division or the Business;

(n)     the loss of any material customer or supplier;

(o)     any action taken by Seller or its affiliates that, if such action were taken after the date hereof and prior to the Closing, would result in a violation or breach of Section 7.1 hereof; or

(p)     the agreement of Seller or any of its affiliates to do any of the foregoing, except as otherwise expressly contemplated hereby and by the Ancillary Agreements.

5.18     Insurance. The properties and assets of Seller and its affiliates which are of an insurable character and are used or useful in the Business are insured against loss or damage by fire or other risks, and Seller or its affiliates maintain liability insurance, to the extent and in the manner and covering such risks as is customary for companies engaged in a business similar to the Business or owning assets similar to the Assets. The coverage under each such policy and binder is in full force and effect, and no notice cancellation or nonrenewal with respect to any such policy or binder has been received by Seller or any affiliate. Schedule 5.18 lists insurance maintained by Seller or its affiliates on the Assets and with respect to the employees and representatives of the Business and the operations of the Business.

5.19     Affiliate Transactions. Except as set forth in Schedule 5.19, there are no agreements, arrangements, undertakings or other transactions between the Division and any other division or business of Seller or any affiliate of Seller.

5.20     Tax Matters. All Tax Returns required to be filed by Seller or its affiliates on or before the Closing Date with respect to the Business or its activities, properties or employees have been or shall be timely filed and all Taxes which are due on such returns have been or shall be timely paid or accrued within the prescribed period, including any extension thereof. There are no Liens upon any of the Assets in respect of Taxes except for Liens for current Taxes that are not yet due and payable. All Taxes required to be withheld by Seller or its affiliates with respect to the Business or its activities, properties or employees have been withheld and paid over to the appropriate Tax authority. None of Seller and its affiliates (or any predecessor of any of them) is a party to or has received any notice with respect to any proposed or pending action by any governmental authority for assessment or collection of Taxes with respect to the Business or its activities, properties or employees, nor is Seller or any affiliate a party to any dispute or threatened dispute in which action or dispute an adverse determination

02/05/08 5:19 PM

reasonably could be expected to result in a foreclosure of the Assets and no such claim for assessment or collection of Taxes has been made upon Seller or any affiliate. None of the Assets is tax-exempt use property within the meaning of Section 168(h) of the Code and none of the Assets is property that is or will be required to be treated as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and as in effect immediately prior to the enactment of the Tax Reform Act of 1986.

For purposes of this Agreement, (i) the term "Tax" or "Taxes" shall mean all United States federal, state and local and all foreign income, profits, franchise, gross receipts, payroll, sales, employment, use, property, excise, value added, net worth, intangible, privilege, business, license, transfer, estimated, stamp, alternative or add-on minimum, environmental, withholding and any other taxes, duties, assessments or other similar governmental charges, together with all interest, penalties and additions imposed with respect to such amounts, (ii) the term "Tax Returns" shall mean any return (including any consolidated combined or unitary return), declaration, estimated, installment, report, claim for refund or information return or statement relating to Taxes which is required to be filed with any governmental agency or other Tax authority, including any schedule or attachment thereto, and including any amendment thereof and (iii) the term "Tax authority" shall mean any authority having jurisdiction over Taxes.

5.21   Material Customers and Suppliers.  Schedule 5.21 sets forth the names of the ten suppliers of the Business to whom Seller or its affiliates paid the greatest sum of money in respect of products and materials sold to the Business and the ten customers of Business from whom Seller or its affiliates received the greatest sum of money in respect of products or services provided by the Business between **January 1, 2005** and **December 31, 2007**.

5.22   Books and Records.  The financial books and records pertaining to the Business are complete and correct in all material respects, have been maintained in accordance with good business practice, and reflect the basis for the financial position and results of operations of the Business set forth in the Financial Statements.

5.23   Disclosure.  This Agreement and the related Schedules hereto contain no untrue statement of any material fact nor omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

5.24   Survival of Representations and Warranties.  The representations, warranties, covenants and agreements made by Seller in this Agreement, and in any agreements or other documents delivered pursuant to this Agreement, shall survive the Closing and shall remain in full force and effect, regardless of any investigations made by or on behalf of any Party, but subject to all express limitations and other provisions contained in this Agreement.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that:

02/05/08 5:19 PM