# EXHIBIT N
## Part 2

6.1     Organization and Power. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has full corporate power and authority to enter into and perform this Agreement.

6.2     Due Authorization; No Breach. (a) The execution and performance by Buyer of this Agreement, the Ancillary Agreements to which it is a party and each of the other agreements contemplated hereby and the transactions contemplated hereby and thereby has been approved by its Board of Directors, and no further corporate action is required to be taken by it in order to execute, deliver and perform this Agreement. Each of this Agreement and the Ancillary Agreements to which it is a party is a valid and legally binding obligation of Buyer, and each agreement or instrument contemplated by this Agreement, when executed and delivered by Buyer, in accordance with the provisions hereof, will be a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms. All persons who have executed this Agreement on behalf of Buyer, or who will execute on behalf of Buyer, any agreement or instrument contemplated by this Agreement, have been duly authorized to do so by all necessary corporate action.

6.3     Survival of Representations and Warranties. The representations, warranties, covenants and agreements made by Buyer in this Agreement, and in any agreements or other documents delivered pursuant to this Agreement, shall survive the Closing and shall remain in full force and effect, regardless of any investigations made by or on behalf of any Party, but subject to all express limitations and other provisions contained in this Agreement.

## ARTICLE VII

## PRE-CLOSING COVENANTS

7.1     Conduct of the Business. From the date hereof until the Closing, or termination of this Agreement in accordance with Article IX hereof, Seller will and will cause its affiliates to:

(a)     operate the Business only in the usual and ordinary course of business consistent with past practice and do all acts and things as may be necessary or advisable to preserve, protect and maintain intact the Assets and the Business as a going concern;

(b)     use reasonable best efforts to keep available the services of the officers, employees and consultants relating to the Business and to preserve the relationships of Seller and its affiliates with customers, suppliers, licensors, licensees, advertisers, distributors and other persons with which the Business has significant business relations;

(c)     comply in all material respects with all laws applicable to the Business;

(d)     make payments on payables relating to the Business in a manner consistent with past practice and collect receivables relating to the Business in a manner consistent with past practice;

(e)     refrain from entering into or renewing any contract, lease or other agreement required to be set forth (or would be required to be set forth if entered into prior to the date hereof) on Schedule 5.14;

(f)     refrain from taking any action which reasonably could be expected to render any representation or warranty of Seller contained herein untrue or incorrect in any material respect (except to the extent a representation or warranty is qualified by materiality, in which case Seller will refrain from taking any action which would render such representation or warranty untrue or incorrect in any respect) as of the Closing;

(g)     refrain from making any acquisition of any assets relating to the Business other than in the ordinary course of business consistent with past practice;

(h)     refrain from making any disposition of any assets (including the Assets) relating to the Business other than in the ordinary course of business consistent with past practice;

(i)     make capital expenditures as set forth in Schedule 7.1(i) [the budget previously provided to Buyer] and refrain from making any commitment for any other capital expenditures relating to the Business in excess of **$25,000.00**;

(j)     refrain from permitting any of the Assets to become subject to any Encumbrances, except Permitted Encumbrances;

(k)     maintain insurance as currently in effect;

(l)     give Buyer a copy of any notice from any governmental or regulatory authority or any other person alleging any violation of any rule, regulation, law or ruling;

(m)     not settle any lawsuit or claim involving the payment in excess of **$25,000.00** or imposing any continuing liability or obligation (whether monetary or non-monetary) on the Business or any of the Assets;

(n)     not waive any claims or rights relating to the Assets or the Business except in the ordinary course of business consistent with past practice;

(o)     not grant any increase in the compensation of any employees of the Business, except for reasonable increases in the ordinary course of business consistent with past practice not in excess of $10,000.00 for any employee or $25,000.00 in the aggregate;

(p)     not change payment terms or conditions in effect with respect to the customers or suppliers of the Business other than in the ordinary course of business;

(q)     not sell, transfer, license, encumber or dispose of any Intellectual Property;

(r)  refrain from making any change in accounting methods, principles or practices relating to the Business, except as required by changes to GAAP; and

(s)  refrain from agreeing to do any of the foregoing.

7.2  <u>Access to Books, Records and Facilities</u>. Seller agrees that, prior to the Closing, Seller and its affiliates will permit Buyer and its representatives and advisors full access during normal business hours and upon reasonable notice to all of their respective plants, properties, books, contracts and records used in or relating to the conduct of the Business and will furnish Buyer and its representatives during such period, upon reasonable notice, with all such financial, operating and other information concerning the Assets and the conduct of the Business as Buyer or its representatives may reasonably request. Prior to the Closing, Seller shall also allow Buyer and its representatives and advisors (i) to consult with representatives, officers, employees and accountants of Seller and its affiliates, (ii) access to all audit working papers used in connection with the Financial Statements and (iii) access to such other documents and information concerning the Assets, the Division and the Business as Buyer and its representatives and advisors may reasonably request.

7.3  <u>Negotiations with Third Parties</u>. From the date hereof through the Closing or, if earlier, the termination of this Agreement pursuant to Article IX, Seller will not directly or indirectly, through any director, employee, affiliate, representative, agent or otherwise, (i) solicit, initiate, encourage or assist in the submission of any inquiries, proposals or offers from any corporation, partnership, person, or other entity or group (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) (other than Buyer, its associates and affiliates and officers, partners, employees and other authorized representatives of Buyer or such affiliates or associates) (collectively, "Third Parties") relating to any acquisition or purchase of assets of, or any equity interest in, the Business or any form of recapitalization transaction, merger, consolidation, business combination, spin-off, liquidation or similar transaction involving, directly or indirectly, the Business (each, an "Acquisition Proposal"), (ii) participate in any discussions or negotiations regarding an Acquisition Proposal or furnish to any Third Party any information concerning the Business or the transactions contemplated hereby or (iii) otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any Third Party to make or enter into an Acquisition Proposal. Should Seller or any of its affiliates receive any inquiry, proposal or offer to enter into any transaction of the type referred to in clauses (i), (ii) or (iii) above, Seller will promptly inform Buyer of the terms thereof and the identity of the party making such inquiry, proposal or offer. Prior to the Closing, at Buyer's request, Seller shall use its best efforts to cause the destruction or return of all non-public, confidential or proprietary information concerning the Business provided to potential buyers of the Business.

7.4  <u>Financing</u>. Seller shall provide, and will cause its affiliates and their respective officers and employees to provide, all necessary cooperation in connection with the arrangement and obtaining of the Financing as may be reasonably requested by Buyer, including facilitating customary due diligence and arranging senior officers of the Business, as selected by Buyer, to meet with prospective lenders and investors in customary "road show" presentations or otherwise. Seller shall use its reasonable best efforts to prepare and deliver such consolidated financial statements of the Business complying with the disclosure requirements of

25

02/05/08 5:19 PM

Regulation S-X promulgated under the Securities Act of 1933, as amended ("S-X Financial Statements"), as reasonably requested by Buyer in connection with the arrangement and obtaining of the Financing. Seller shall take such further action as may be required to cause Seller's accounting firm, its independent auditors, to provide any unqualified opinions, consents or customary comfort letters with respect to the S-X Financial Statements. Seller agrees to allow Buyer's accounting representatives the opportunity to review the S-X Financial Statements in draft form and to allow such representatives access to the accountant's workpapers with respect to the preparation of such financial statements.

7.5     Notification of Certain Matters. Seller shall give prompt notice to Buyer, and Buyer shall give prompt notice to Seller, of (i) the occurrence or non-occurrence of any event the occurrence or non-occurrence of which would be likely to cause any representation or warranty contained in this Agreement to be untrue or inaccurate and (ii) any failure of Seller or Buyer, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that the delivery of any such notice shall not limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

7.6     Financial Statements and Reports. (a) As promptly as practicable and in any event no later than thirty days after the end of each fiscal month ending after the date hereof and before the Closing Date (other than the last fiscal month) or sixty days after the end of each fiscal year ending after the date hereof and before the Closing Date, as the case may be, Seller will deliver to Buyer true and complete copies of (in the case of any such fiscal year) the audited and (in the case of any such fiscal month) the unaudited consolidated balance sheets and the related audited or unaudited consolidated statements of income and cash flows of the Business as of and for the fiscal year then ended or as of and for each such fiscal month and the portion of the fiscal year then ended, as the case may be, together with the notes, if any, relating thereto, which financial statements shall be prepared on a basis consistent with the Financial Statements.

(b)     As promptly as practicable, Seller will deliver to Buyer true and complete copies of such other regularly-prepared financial statements, reports and analyses as may be prepared by Seller relating to the Business or operations of the Division.

ARTICLE VIII

CONDITIONS OF CLOSING

8.1     Seller's Conditions. The obligations of Seller to consummate the transactions contemplated by this Agreement are, unless waived by Seller, subject to the fulfillment on or before the Closing, of each of the following conditions:

(a)     No statute, rule, regulation, injunction or restraining order shall be in effect to forbid or enjoin the consummation of the transactions contemplated by this Agreement;

(b)     Seller shall have received all certificates, instruments, agreements and other documents to be delivered by Buyer at or before the Closing as provided in this Agreement in form and substance reasonably satisfactory to Seller;

(c)     All agreements and covenants of Buyer under this Agreement to be performed prior to the Closing shall have been performed in all material respects;

(d)     The representations and warranties of Buyer contained in this Agreement qualified as to materiality shall be true in all respects, and those not so qualified shall be true in all material respects, in each case when made and on and as of the Closing Date with the same force and effect as if made on and as of such date (except to the extent in any case that such representations and warranties speak as of another date);

(e)     All corporate actions, proceedings, instruments and documents of Buyer required to carry out the transactions contemplated by this Agreement or incidental thereto and all other legal matters shall be reasonably satisfactory to counsel for Seller, and such counsel shall have been furnished with such certified copies of such corporate actions and proceedings and such other instruments and documents as it shall have reasonably requested.

8.2     <u>Buyer's Conditions</u>. The obligations of Buyer to consummate the transactions contemplated by this Agreement are, unless waived by Buyer, subject to the fulfillment, on or before the Closing, of each of the following conditions:

(a)     No statute, rule, regulation, injunction or restraining order shall be in effect to forbid or enjoin the consummation of the transactions contemplated by this Agreement or to impose material limitations on the ability of Buyer to effectively acquire and hold the Assets;

(b)     Buyer shall have received all certificates, instruments, agreements, and other documents to be delivered by Seller at or before the Closing as provided in this Agreement in form and substance reasonably satisfactory to Buyer;

(c)     All agreements and covenants of Seller under this Agreement to be performed prior to the Closing shall have been performed in all material respects;

(d)     The representations and warranties of Seller contained in this Agreement qualified as to materiality shall be true in all respects, and those not so qualified shall be true in all material respects, in each case when made and on and as of the Closing Date with the same force and effect as if made on and as of such date (except to the extent in any case that such representations and warranties speak as of another date); and the aggregate effect of all inaccuracies in the representations and warranties of Seller contained in this Agreement (without giving effect to any qualifications as to materiality) would not reasonably be expected to have a Material Adverse Effect;

(e)     All approvals, Consents or authorizations required for the transfer of the Assets to Buyer and for the consummation of the transactions contemplated by this

Agreement shall have been obtained, except where the failure to have obtained any such approval, Consent or authorization would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(f) There shall have been no event, occurrence or state of circumstances or facts which has resulted in, or would reasonably be expected to result in, a Material Adverse Effect;

(g) No litigation or proceeding shall have been commenced or threatened for the purpose of enjoining or otherwise preventing the consummation of any of the transactions contemplated by this Agreement or that would reasonably be expected to have a Material Adverse Effect; and

(h) All corporate actions, proceedings, instruments and documents of Seller and its affiliates required to carry out the transactions contemplated by this Agreement or incidental thereto and all other legal matters shall be reasonably satisfactory to counsel for Buyer, and such counsel shall have been furnished with such certified copies of such corporate actions and proceedings and such other instruments and documents as it shall have reasonably requested.

(f) If Buyer does not complete within three(3) months from the date Seller has provided all of the due diligence materials, including the financial audit statements, to Buyer, then Buyer shall have a right to terminate this Agreement without a penalty.

ARTICLE IX

TERMINATION; SURVIVAL

9.1 <u>Termination by Buyer or Seller</u>. Anything herein or elsewhere to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to or at the Closing by:

(a) mutual written consent of Seller and Buyer;

(b) Seller or Buyer, by written notice to the other, if (i) there shall have been a breach of any representation or warranty on the part of the other Party which would reasonably be expected to result in a closing condition not being satisfied, or (ii) there shall have been a breach of any covenant or agreement on the part of the other Party which would reasonably be expected to result in a closing condition not being satisfied, which breach, in either case, shall not have been cured prior to 30 days following notice thereof; or

(c) Seller or Buyer, by written notice to the other, if a court of competent jurisdiction or governmental, regulatory or administrative agency or commission shall have issued an order, decree or ruling or taken any other action, in each case permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and such order, decree, ruling or other action shall have become final and nonappealable.

9.2    Survival. If this Agreement is terminated pursuant to Section 9.1 hereof, this Agreement shall become void and of no further force and effect, except for the provisions of Sections 11.1(a), 12.2, 12.3, 12.4, 12.5 and 12.13 hereof; provided that such termination shall not relieve any party from liability for any breach of this Agreement.

## ARTICLE X

## EMPLOYEES AND EMPLOYEE BENEFITS

10.1    Employment. Buyer will offer employment to those employees of Seller listed on Schedule 10.1 hereto, with such changes, deletions or additions thereto as may occur from the date hereof to the Closing in the ordinary course of business (the "Transferred Employees"); provided, however that Buyer may terminate, at Buyer's sole discretion and expense, at any time after the Closing the employment of any Transferred Employee with Buyer. For purposes of this Article X, Transferred Employees shall not include any person on disability, layoff or leave of absence as of the Closing. Buyer shall not assume responsibility for any Transferred Employee until such employee commences employment with Buyer.

10.2    Employee Benefit Plans. (a) Seller shall retain all assets (including any plan overfundings) and all liabilities and obligations in respect of benefits, contributions or premiums accrued prior to the Closing by employees of Seller (including Transferred Employees) under (i) any Seller Plans, (ii) any group life, accident, medical, dental or disability plan or similar arrangement or (iii) any worker's compensation arrangements, and Buyer shall not have any liability with respect thereto. No assets of any of the Seller Plans shall be transferred to Buyer or to any plan of Buyer.

## ARTICLE XI

## EXPENSES AND POST CLOSING OBLIGATIONS

11.1    Taxes and Other Charges. (a) Seller shall be responsible for and shall pay any ad valorem real property taxes and general and special assessments and any ad valorem personal property taxes, including any interest or penalties thereon, which are attributable or are assessed with respect to the operation and ownership of the Business for periods and events prior to the Closing.

(b)    Regardless of whether or not the transactions contemplated hereby are consummated, each party to this Agreement shall pay all expenses incurred by it or on its behalf in connection with the preparation, authorization, execution and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby, including, but not limited to, all fees and expenses of all consultants, brokers, investment bankers, agents, representatives, counsel and accountants engaged by such party; except that: (i) Seller bear the costs of obtaining title insurance for the Real Property and (ii) Seller shall bear any liability for all sales, use, transfer, motor vehicle and similar Taxes (including, without limitation, all recording fees and related charges) arising from or attributable or related to the sale, transfer or assignment to Buyer of any of the Assets.

(c)     Seller and Buyer shall cooperate regarding the filing of any Tax Returns relating to the Business that cover a period which includes the date of the Closing. Property Tax Returns will be filed by the party that owns the property subject to the return on the assessment date for the property tax.

(d)     Seller, at its option, shall have sole control over any contest (including claims for refund or challenges of tax assessments) that relates to liability for taxes for periods, or portions thereof, ending on or prior to the date of the Closing, subject to approval of Buyer relating to any going-forward liability reasonably likely to be imposed on Buyer or the Business thereafter for taxes.

11.2    Restriction. From the date of the Closing until the 5th anniversary of the Closing, Seller shall not, and shall not permit any of its affiliates to, directly or indirectly, anywhere in the world, (i) engage in **Restricted Business**, (ii) license or permit any person or entity to use technology or Trade Secrets hereby transferred by Seller to Buyer or (iii) employ or solicit to hire, or otherwise receive the services of, any Transferred Employee (x) so long as such Transferred Employee is employed by any of Buyer and its subsidiaries or their respective transferees and assigns and (y) prior to the 5th anniversary of the termination of such employment. If Buyer (or a transferee of Buyer) transfers, directly or indirectly, by sale of stock, merger, sale of assets or otherwise, any part of the Business to one or more third parties, Seller's agreements in this Section 11.2 shall continue with respect to such third party transferees and each transferee shall have the same rights as Buyer hereunder. The parties agree that the remedy at law for any breach of any obligation under this Section 11.2 will be inadequate and that in addition to any other rights and remedies to which they may be entitled hereunder, at law or in equity, Buyer and its transferees shall be entitled to injunctive relief and reimbursement for all reasonable attorney's fees and other expenses incurred in connection with the enforcement hereof. In the event this Section 11.2 is held to be in any respect an unreasonable restriction upon Seller or any of its affiliates by any court having competent jurisdiction, the court so holding may reduce the territory to which this Section 11.2 pertains and/or the period of time for which it operates, or effect any other change to the extent necessary to render this Section 11.2 enforceable by such court. As so modified, this Section 11.2 will continue in full force and effect. Such decision by a court of competent jurisdiction shall not invalidate this Agreement, but this Agreement shall be interpreted, construed and enforced as not containing such invalidated provision. All of the Transferred employees and the board members shall execute a separate restrictive covenant that are substantially similar to this Section 11.2 at Closing. The term "Restricted Business" as used in this Section 11.2 means any media business, including not limited to radio, internet, television, cable, satellite, and printed materials, that are relating to Asian markets in the United States.

11.3    Insurance Data. To the extent that, after the Closing, either Buyer or Seller requires any information regarding claim data, payroll or other information in order to make filings with insurance carriers relating to the Business, Seller shall promptly supply such information to Buyer and Buyer shall promptly supply such information to Seller.

11.4    Access to Books, Records and Facilities. Seller agrees that, after the Closing for a period of **seven(7)** years, it will permit Buyer and its representatives, during normal business hours and upon reasonable advance notice, to have access to and to examine and make

02/05/08 5:19 PM

copies of (i) all books and records, including Tax Returns, of Seller (except books and records protected by attorney-client or other privilege which Seller may be entitled to assert against Buyer in any pending or threatened proceeding, suit or action) and its affiliates which relate to the Business to the extent that the events reflected therein relate to transactions or events occurring prior to the Closing or to transactions or events occurring subsequent to the Closing which arise out of transactions or events occurring prior to the Closing and (ii) all documents listed in the Schedules attached hereto and all files, records and papers of any and all proceedings and matters listed in the Schedules hereto. All books and records of Seller and its affiliates relating to the Business will be preserved by Seller and its affiliates in accordance with their respective records retention policies, but in no event for a period of less than **seven(7)** years following the Closing. Prior to any destruction or disposition by Seller or its affiliates of any books and records relating to the Business, Seller will notify Buyer in writing and Buyer shall have the right to receive and retain such books and records at its expense. Buyer agrees that, after the Closing for a period of **seven(7)** years, it will permit, and will cause its subsidiaries to permit, Seller and its representatives full access during normal business hours and upon reasonable advance notice to all of its and their respective properties, plants and facilities used in connection with the Business, and to have access to the Books and Records (except records protected by attorney-client or other privilege which Buyer or its affiliates may be entitled to against Seller in any pending or threatened proceeding, action or suit), to the extent that any of the foregoing relates to periods prior to the Closing, and is reasonably necessary in connection with any then pending or threatened litigation, claim, liability, or judicial or administrative matters in which Seller is involved and which involves or arises out of the ownership or operation of the Business by Seller.

      11.5    <u>Access to Personnel</u>. For Seven(7) after the Closing Date, Buyer and its representatives shall be entitled to such access as Buyer may reasonably request to the representatives, officers and employees of Seller and its affiliates, wherever located, who are employed by Seller and its affiliates and who were directly or indirectly involved in the Division or the Business prior to the Closing Date.

      11.6    <u>Information</u>. (a) Seller agrees to keep confidential and not disclose to any person or use for its own benefit any information relating to the Business or the Assets except information which is in the public domain and except as Seller may be legally required to disclose information pursuant to applicable law, regulation, court or administrative order.

      (b) Seller agrees to use its best efforts to enforce, at the request of Buyer, the provisions of any confidentiality or non-disclosure agreements entered into between Seller or any of its affiliates and any other party (including any potential buyer of the Business or any employee) to the extent such provisions relate to information relating to the Business or the Assets. Buyer shall reimburse Seller for its reasonable out-of-pocket costs in connection with any action taken by Seller under this Section 11.6(b).

      11.7    <u>Further Agreements</u>. Seller authorizes and empowers Buyer on and after the Closing Date to receive and open all mail received by Buyer relating to the Business or the Assets and to deal with the contents of such communications in any proper manner. Seller shall promptly deliver to Buyer any mail or other communication received by it after the Closing Date

pertaining to the Business or the Assets and any cash, checks or other instruments of payment to which Buyer is entitled (with all necessary endorsements).

## ARTICLE XII

## MISCELLANEOUS

12.1 <u>Publicity</u>. The Parties agree that no publicity, release or announcement concerning the execution of this Agreement, any of the provisions of this Agreement or the transactions contemplated hereby shall be issued without the advance written approval of the form and content of the same by the Parties; provided, however, that no such consent shall be required when such disclosure is required by applicable law, regulation, court or administrative order.

12.2 <u>Confidentiality</u>. Each of Seller and Buyer confirms that the terms of the confidentiality agreement, dated on or about February 1, 2007, shall remain in full force and effect in accordance with its terms.

12.3 <u>Notices</u>. Any notices or communications permitted or required hereunder shall be deemed sufficiently given if hand-delivered, or sent by (i) registered or certified mail return receipt requested, (ii) telecopy or other electronic transmission service (to the extent receipt is confirmed) or (iii) by overnight courier, in each case to the parties at their respective addresses and telecopy numbers set forth below, or to such other address of which any party may notify the other party in writing.

If to Seller, to

Korean Daily Tribune, Inc.

1330 Willow Avenue

Elkins Park, PA 19027

Tel: 215-935-5000

bohlim@chosundaily.com

If to Buyer, to

STV Networks, Inc.

C/O Law Offices of Young K. Park

2009 Chestnut Street

Philadelphia, PA 19103

Attention: Young K. Park, Esquire
Telephone: 215-564-2901
Fax: 215-564-2932

    12.4    <u>Brokers</u>. Each of the Parties represents and warrants to the other that, no broker or finder has acted on its behalf in connection with the transactions contemplated by this Agreement. Each of the Parties agrees to indemnify, defend and hold the other party harmless against any claim or demand for any commission, compensation or other payment by any other broker, finder or similar agent claiming to have been or that was in fact employed by or on behalf of it.

    12.5    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon, and inure to the benefit of, all the Parties and their respective successors, legal representatives and assigns permitted in accordance with this Section 12.6. Nothing herein shall create or be deemed to create any third party beneficiary rights in any person or entity not a party hereto (including, without limitation, any employee or former employee of Seller or its affiliates, the Division or the Business). No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of law or otherwise) without the prior written consent of the other party, and any attempted assignment without the required consents shall be void; provided, however, that no such consent shall be required for Buyer to assign part or all of its rights and obligations under this Agreement prior to the Closing to one or more subsidiaries of Buyer, or after the Closing to any third party.

    12.6    <u>Exhibits and Schedules</u>. All Exhibits and Schedules hereto and the documents and agreements referred to herein to be delivered and the acts to be performed at or subsequent to the Closing are incorporated herein and expressly made a part of this Agreement as fully as though completely set forth herein.

    12.7    <u>Specific Performance</u>. Each of Seller and Buyer acknowledges that the other will have no adequate remedy at law if it fails to perform any of its obligations under this Agreement. In such event, the performing party shall have the right, in addition to any other rights it may have, to specific performance of this Agreement.

    12.8    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all, of the parties. In pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one such counterpart.

02/05/08 5:19 PM

12.9 <u>Headings; Interpretation</u>. (a) The headings contained in this Agreement are inserted for convenience of reference only and shall not otherwise affect the meaning or interpretation or be deemed a substantive part of this Agreement.

(b) Except to the extent that the context otherwise requires "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

12.10 <u>Waiver</u>. The failure of any party at any time or times to enforce or require performance of any provision hereof shall in no way operate as a waiver or affect the right of such party at a later time to enforce the same. No waiver by any party of any condition or the breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach, or a waiver of any other condition or of any term, covenant, representation or warranty contained in this Agreement. Any agreement on the part of a party hereto to a waiver shall be valid only if set forth in an instrument in writing signed by such party.

12.11 <u>Severability</u>. If any provision of this Agreement shall hereafter be held to be invalid or unenforceable for any reason, that provision shall be reformed to the maximum extent permitted to preserve the parties' original intent, failing which, it shall be severed from this Agreement with the balance of this Agreement continuing in full force and effect. Such occurrence shall not have the effect of rendering the provision in question invalid in any other jurisdiction or in any other case or circumstances, or of rendering invalid any other provisions contained herein to the extent that such other provisions are not themselves actually in conflict with any applicable law.

12.12 <u>Governing Law and Forum</u>. This Agreement and the Ancillary Agreements shall be governed by and construed in accordance with the laws of the State of Pennsylvania. Any action to enforce, which arises out of or in any way relates to, any of the provisions of this Agreement and the Ancillary Agreements may be brought and prosecuted in such court or courts located within the Eastern District of Pennsylvania as provided by law; and the parties consent to the jurisdiction of such court or courts located within Eastern District of Pennsylvania to service of process by registered mail, return receipt requested, or by any other manner provided by Pennsylvania law.

12.13 <u>Waiver of Trial By Jury</u>. Buyer and Seller each waive any right to trial by jury with respect to any claim or action arising out of this Agreement, any Ancillary Agreement or any action or omission of Buyer or Seller in connection with the transactions contemplated hereby or thereby.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

Seller:   **Korean Daily Tribune, Inc.**

By: _____
Name:  David B. Lim
Title:   President

Buyer:   **STV Networks, Inc.**

By: _____
Name: **Mathu Rajan**
Title:   CEO

## Table of Contents

|  | Page |
|---|---|
| ARTICLE I PURCHASE AND SALE OF ASSETS | 1 |
| 1.1 Assets to be Transferred | 1 |
| 1.2 Excluded Assets | 3 |
| 1.3 Assignment of Assets | 3 |
| 1.4 Further Assurances | 4 |
| ARTICLE II CONSIDERATION | 4 |
| 2.1 Purchase Price | 4 |
| 2.2 Allocation of Purchase Price | 4 |
| ARTICLE III LIABILITIES, OBLIGATIONS AND INDEMNITIES | 5 |
| 3.1 Liabilities and Indemnity | 5 |
| 3.2 Indemnification Procedure | 7 |
| ARTICLE IV CLOSING | 8 |
| 4.1 Closing | 8 |
| 4.2 Seller's Closing Deliveries | 8 |
| 4.3 Buyer's Closing Deliveries | 9 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER | 9 |
| 5.1 Organization and Corporate Power | 9 |
| 5.2 Due Authorization; No Breach. | 10 |
| 5.3 Real Property | 10 |
| 5.4 Personal Property | 12 |
| 5.5 Title and Condition of Assets; Entire Business | 12 |
| 5.6 Consents | 13 |
| 5.7 Compliance With Laws | 13 |
| 5.8 Permits and Licenses | 13 |
| 5.9 Environmental Conditions | 13 |
| 5.10 Product Safety | 15 |
| 5.11 Employee Relations | 15 |
| 5.12 Litigation, Claims and Proceedings | 15 |
| 5.13 Intellectual Property | 16 |
| 5.14 Contracts | 16 |
| 5.15 Benefit Plans | 18 |
| 5.16 Financial Statements | 19 |
| 5.17 Absence of Certain Changes or Events | 20 |
| 5.18 Insurance | 21 |
| 5.19 Affiliate Transactions | 21 |
| 5.20 Tax Matters | 21 |
| 5.21 Material Customers and Suppliers | 22 |
| 5.22 Books and Records | 22 |
| 5.23 Disclosure | 22 |
| 5.24 Survival of Representations and Warranties | 22 |
| ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER | 22 |
| 6.1 Organization and Power | 23 |

Case 09-27116   Doc 40-8   Filed 11/16/09   Page 16 of 19
Case 2:08-cv-02399-GP   Document 22-4   Filed 12/04/2008   Page 39 of 58

## Table of Contents

| | | Page |
|---|---|---|
| 6.2 | Due Authorization; No Breach | 23 |
| 6.3 | Survival of Representations and Warranties | 23 |

**ARTICLE VII PRE-CLOSING COVENANTS** .......... 23
| 7.1 | Conduct of the Business | 23 |
| 7.2 | Access to Books, Records and Facilities | 25 |
| 7.3 | Negotiations with Third Parties | 25 |
| 7.4 | Financing | 25 |
| 7.5 | Notification of Certain Matters | 26 |
| 7.6 | Financial Statements and Reports | 26 |

**ARTICLE VIII CONDITIONS OF CLOSING** .......... 26
| 8.1 | Seller's Conditions | 26 |
| 8.2 | Buyer's Conditions | 27 |

**ARTICLE IX TERMINATION; SURVIVAL** .......... 28
| 9.1 | Termination by Buyer or Seller | 28 |
| 9.2 | Survival | 29 |

**ARTICLE X EMPLOYEES AND EMPLOYEE BENEFITS** .......... 29
| 10.1 | Employment | 29 |
| 10.2 | Employee Benefit Plans | 29 |

**ARTICLE XI EXPENSES AND POST CLOSING OBLIGATIONS** .......... 29
| 11.1 | Taxes and Other Charges | 29 |
| 11.2 | Restriction | 30 |
| 11.3 | Insurance Data | 31 |
| 11.4 | Access to Books, Records and Facilities | 31 |
| 11.5 | Access to Personnel | 31 |
| 11.6 | Information | 31 |
| 11.7 | Further Agreements. | 32 |

**ARTICLE XII MISCELLANEOUS** .......... 32
| 12.1 | Publicity | 32 |
| 12.2 | Confidentiality | 32 |
| 12.3 | Notices | 32 |
| 12.4 | Brokers | 32 |
| 12.5 | Binding Effect; Assignment | 33 |
| 12.6 | Exhibits and Schedules | 33 |
| 12.7 | Specific Performance | 33 |
| 12.8 | Counterparts | 33 |
| 12.9 | Headings; Interpretation | 34 |
| 12.10 | Waiver | 344 |
| 12.11 | Severability | 34 |
| 12.12 | Governing Law and Forum | 34 |
| 12.13 | Waiver of Trial By Jury. | 34 |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(b) | Owned Real Property |
| Schedule 1.1(c) | Leased Real Property |
| Schedule 1.1(g) | Assumed Contracts |
| Schedule 1.2 | Excluded Assets |
| Schedule 5.4 | Personal Property |
| Schedule 5.6 | Consents |
| Schedule 5.7 | Compliance with Laws |
| Schedule 5.8 | Permits and Licenses |
| Schedule 5.9 | Environmental Conditions |
| Schedule 5.11 | Employee Relations |
| Schedule 5.12 | Litigation |
| Schedule 5.13(a) | Intellectual Property |
| Schedule 5.13(c) | Trade Secrets |
| Schedule 5.14 | Contracts |
| Schedule 5.15 | Benefit Plans |
| Schedule 5.16 | Financial Statements |
| Schedule 5.17 | Absence of Certain Changes |
| Schedule 5.18 | Insurance |
| Schedule 5.19 | Affiliate Transactions |
| Schedule 5.21 | Material Customers and Suppliers |

## EXHIBITS

| | |
|---|---|
| Exhibit 4.2(h)(i) | Transition Services Agreement |
| Exhibit 4.2(h)(ii) | Trademark License Agreement |

02/05/08 5:19 PM

Exhibit A

| Items | Amount | Monthly Payment | Estimated Maturity | Remarks |
|---|---|---|---|---|
| **Liabilities** | | | | |
| Revolving Credits *** 1 | 250,000-300,000 | | | purchase of color printers, etc |
| Countrywide Home Equity | 100,000 | 5,500.00 | 6-7 years | Culture Center Construction cost   to be paid by Buyer within one(1) year |
| Chosun Contract deposit | 100,000.00 | 1,000.00 | 9 years | when signed contract, co borrowed |
| 5Th Street Deposit | 100,000.00 | 1,500 | 10 years | when co. bought 5Th street Hyundai building, Rev. Kang deposited 100K |
|  |  | 0 | 10 years | instead of paying monthly rent for 10 years. |
| **Total** | 550,700.00 | 9,000.00 | | |

*** 1- exact amount will be calculated when all statement are received.

| Items | Amount | Remarks |
|---|---|---|
| **Assets** | | |
| Chosun Contract Deposit | 100,000.00 | when contract ended, money will be refunded. |
| 1330 Willow Ave Building | 150-200,000.00 | company owns 1/3 of ownership of LLC share which owns 1330 willow ave building. |
|  | 250-300,000.00 | |

## Korean Daily Tribune, Inc. Equipment Inventory List

1. Goss Community Press Machine 6 Unit
2. Goss Community Folder 1 Unit
3. Yale Forklift
4. Aga CTP Unit
5. Dell Desktop Computers
6. HP & Epson Printers
7. Phone Station 1 set
8. Desk & Chair 20 set
9. File Cabinet
10. Scanner
11. Toshiba Fax Machine